No. 2024-1515

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

TELEFONAKTIEBOLAGET LM ERICSSON,

*Plaintiff/Counterclaim Defendant-Appellee,*

ERICSSON AB, ERICSSON, INC.,

*Counterclaim Defendants-Appellees,*

v.

LENOVO (UNITED STATES), INC., MOTOROLA MOBILITY LLC,

*Defendants/Counter-Claimants-Appellants,*

LENOVO (SHANGHAI) ELECTRONICS TECHNOLOGY CO. LTD., LENOVO BEIJING, LTD., LENOVO GROUP LIMITED, MOTOROLA (WUHAN) MOBILITY TECHNOLOGIES COMMUNICATION CO., LTD.,

*Defendants.*

On Appeal from the United States District Court
for the Eastern District of North Carolina
No. 5:23-cv-00569, Judge Terrence W. Boyle

---

## APPELLEES' NON-CONFIDENTIAL OPPOSITION TO APPELLANTS' MOTION TO EXPEDITE BRIEFING AND ORAL ARGUMENT

---

Theodore Stevenson, III
ALSTON & BIRD LLP
Chase Tower, Suite 2300
2200 Ross Avenue
Dallas, TX 75201
(214) 922-3400 (telephone)
ted.stevenson@alston.com

Jeffrey A. Lamken
*Counsel of Record*
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000 (telephone)
jlamken@mololamken.com

*Counsel for Appellees*
*(Additional Counsel Listed on Next Page)*

Blake H. Bailey
MᴄKᴏᴏʟ Sᴍɪᴛʜ, P.C.
600 Travis Street, Suite 7000
Houston, TX  77002
(713) 485-7300 (telephone)
bbailey@mckoolsmith.com

Nicholas M. Mathews
Alexander J. Chern
MᴄKᴏᴏʟ Sᴍɪᴛʜ, P.C.
300 Crescent Court, Suite 1200
Dallas, TX  75201

Lucas M. Walker
Rayiner Hashem
Caleb Hayes-Deats
Kayvon Ghayoumi
MᴏʟᴏLᴀᴍᴋᴇɴ LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037

Catherine Martinez
MᴏʟᴏLᴀᴍᴋᴇɴ LLP
430 Park Avenue,
New York, NY  10022

*Counsel for Appellees*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1515 |
| **Short Case Caption** | Telefonaktiebolaget LM Ericsson v. Lenovo (United States), Inc. |
| **Filing Party/Entity** | Telefonaktiebolaget LM Ericsson; Ericsson AB; Ericsson, Inc. |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/11/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Telefonaktiebolaget LM Ericsson | | N/A. |
| Ericsson AB | | Telefonaktiebolaget LM Ericsson |
| Ericsson, Inc. | | Telefonaktiebolaget LM Ericsson |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable                ☐    Additional pages attached

| | | |
|---|---|---|
| Alston & Bird LLP: | Thomas G. Walker; John Daniel Haynes | Katherine Donald; Matthew Patrick McGuire |
| McKool Smith, P.C.: | Kevin Hess | Raymond Mitchell Verboncoeur |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑    Yes (file separate notice; see below)    ☐    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable                ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................. 4

I.    Lenovo Profits From Infringing Ericsson's SEPs for Over a Decade
      While Refusing To License Them ................................................ 4

II.   Ericsson and Lenovo Initiate Global Litigation as Lenovo Spurns
      Ericsson's FRAND Offer ............................................................ 6

      A.    Ericsson's Offer to Lenovo of License Terms Accepted by
            Others ................................................................................ 6

      B.    Ericsson's Eastern District of North Carolina Proceeding ................. 7

      C.    Lenovo's U.K. Proceedings .................................................. 7

      D.    Ericsson's Brazil Proceeding .............................................. 7

      E.    Ericsson's Colombia Proceedings ....................................... 8

III.  Lenovo's Motion for an Antisuit Injunction Directed To The
      Ericsson-Initiated South American Proceedings ........................... 9

      A.    Lenovo Demands That the District Court Issue an Antisuit
            Injunction Interfering with Foreign Suits Involving Foreign
            Patents ................................................................................ 9

      B.    The District Court Denies Lenovo's Requested Injunction ............... 11

      C.    Lenovo Appeals and Moves To Expedite ........................... 12

ARGUMENT ..................................................................................... 12

I.    Lenovo Fails To Show Irreparable Harm .................................. 14

      A.    Alleged "Pressure" To Settle Is Not Irreparable Harm .................... 14

      B.    Lenovo's Conduct Belies Any Urgency ............................. 17

II.   Lenovo Lacks a Meritorious Appeal ............................................................ 18

      A.    Lenovo Fails To Show a Substantial Issue on Appeal ...................... 18

      B.    Lenovo Cannot Show the District Court Would Be Justified in
            Interfering with Foreign Proceedings ................................................. 21

III.  Expediting This Appeal Would Exacerbate The Intrusion Into Foreign
      Proceedings and Deprive This Court of a Full Record ............................... 22

CONCLUSION ................................................................................................. 23

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on page 6 and in Exhibit B describe confidential business information regarding licensing.

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Apple Inc. v. Samsung Elecs. Co.*,
    809 F.3d 633 (Fed. Cir. 2015)...........................................................16

*Apple, Inc. v. Motorola, Inc.*,
    757 F.3d 1286 (Fed. Cir. 2014) ...................................................20, 21

*China Trade & Dev. Corp. v. M.V. Choong Yong*,
    837 F.2d 33 (2d Cir. 1987) ...............................................................11

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017)............................................................15

*Ericsson Inc. v. Apple Inc.*,
    2022 WL 19403865 (E.D. Tex. 2022).........................................15, 22

*Genentech, Inc. v. Novo Nordisk, A/S*,
    108 F.3d 1361 (Fed. Cir. 1997).........................................................19

*HTC Corp. v. Telefonaktiebolaget LM Ericsson*,
    12 F.4th 476 (5th Cir. 2021)...............................................................6

*Huawei Techs., Co. v. Samsung Elecs. Co.*,
    2018 WL 1784065 (N.D. Cal. Apr. 13, 2018)............................19, 20

*Koninklijke Philips N.V. v. Thales DIS AIS USA LLC*,
    39 F.4th 1377 (Fed. Cir. 2022) .........................................................15

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
    731 F.2d 909 (D.C. Cir. 1984) ..........................................................21

*LeBoeuf, Lamb, Greene & MacRae, L.L.P v. Abraham*,
    2003 WL 21384634 (D.C. Cir. May 28, 2003) ...........................13, 18

*Microsoft Corp. v. Motorola, Inc.*,
    795 F.3d 1024 (9th Cir. 2015)......................................................12, 20

iii

*Microsoft Corp. v. Motorola, Inc.*,
    696 F.3d 872 (9th Cir. 2012) ................................................................12, 19, 20

*Purepac Pharm. Co. v. Thompson*,
    2003 WL 174023 (D.C. Cir. Jan. 21, 2003) ...............................................13, 18

*Winter v. NRDC*,
    555 U.S. 7 (2008) ........................................................................................11, 18

## RULES AND STATUTES

9th Cir. R. 27-12 ...........................................................................................13

D.C. Cir. Handbook of Internal Proc. 33 ..................................................13

Fed. Cir. Practice Notes to R. 27 .....................................................12, 18

Fed. Cir. R. 33 ...............................................................................................22

## OTHER AUTHORITIES

Lenovo Earnings: Q3 2023/2024 (Feb. 22, 2024),
    https://news.lenovo.com/pressroom/press-releases/q3-fy-2023-24 ...................15

## **INTRODUCTION**

Lenovo can move to expedite—asking that its appeal jump ahead of others that have been pending far longer—only by overlooking the facts and legal principles. Lenovo does not mention that, for over a ***decade***, it concededly has been selling phones that infringe patented Ericsson technology, while steadfastly refusing to license Ericsson's patents. Lenovo infringes despite Ericsson's repeated offers to license Ericsson's "standard-essential" patents ("SEPs") on "fair, reasonable, and non-discriminatory" ("FRAND") terms. While its competitors have taken licenses, Lenovo has refused. The most recent phase of Lenovo's infringement campaign began in 2019, when it began selling 5G phones using Ericsson standard-essential inventions. Since then, Lenovo has not merely refused to license Ericsson's 5G SEPs, despite Ericsson's repeated entreaties. For more than two years, it has refused ***even to sign an NDA*** to allow meaningful license negotiations to proceed.

Ericsson finally sued to enforce its patent rights in the Eastern District of North Carolina. But it still gave Lenovo another chance—offering to license its 5G patents at a rate consistent with what other phone makers have agreed to pay. And Ericsson asked the district court to declare that offer was FRAND. Lenovo's response, two days later, was to sue Ericsson in the U.K. Ericsson then sued Lenovo in Brazil and Colombia, where Lenovo has a major presence. Lenovo appeared in the Brazilian case and raised many of the arguments it raises here—*i.e.*, that a

preliminary injunction would be inappropriate because the U.S. or U.K. courts may declare a FRAND rate. The Brazilian court issued a preliminary injunction after hearing Lenovo's objections. And Lenovo declined to exercise its right to intervene in the trial-level proceedings in Colombia.

Lenovo appealed the foreign injunctions—raising its FRAND arguments—but did not wait for appellate review in the foreign courts. Instead, it sought an antisuit injunction from the North Carolina court to bar Ericsson from enforcing the injunctions. Lenovo tried to characterize the Brazilian and Colombian suits as a sneak attack that subjected it to unfair proceedings and draconian penalties while it was diligently trying to negotiate a license with Ericsson. But Lenovo ignored the decade-plus of infringement leading to those suits, and the domestic legal principles that led the Brazilian and Colombian courts to grant preliminary injunctions. The district court properly balked at Lenovo's requested intrusion into foreign proceedings and denied the antisuit injunction.

Lenovo now insists that this Court expedite its appeal. But Lenovo comes nowhere close to showing that it should be allowed to cut to the front of the line. Lenovo urges it *could* suffer "irreparable harm" if the Brazilian and Colombian injunctions so weaken its bargaining leverage that it accepts a license from Ericsson (on terms others have accepted) and settles the North Carolina proceeding. But settlement is not irreparable harm. The Brazilian and Colombian injunctions,

moreover, arise from Lenovo's sale of infringing devices in jurisdictions that make injunctions the primary remedy for patent infringement. Facing the consequences imposed by governing law for one's own wrongful conduct is not irreparable harm either.

Lenovo, moreover, says almost nothing about the merits of its appeal. But Lenovo cannot claim expedition is needed to avoid harm if affirmance will follow anyway; expedition is unwarranted absent some showing on the merits. The ordinary rule is that parallel lawsuits in multiple countries proceed without interference—as Lenovo knows, having filed its *own foreign suit* two days after Ericsson filed in the U.S. The district court ruled that the "threshold" requirement for an antisuit injunction was not satisfied, because the U.S. proceeding will not necessarily dispose of the foreign proceedings. Lenovo does not explain why that decision is incorrect. And even if that threshold requirement were met, Lenovo fails to justify the grave intrusion into foreign court proceedings it seeks.

Lenovo also fails to justify the prejudice its motion threatens to Ericsson, other litigants, and this Court's processes. Lenovo's appeals of the Brazilian and Colombian injunctions raise many of the arguments Lenovo raises here. Decisions on those appeals are expected soon, such that, on an ordinary schedule, Ericsson would likely be able to address those decisions in its response brief, or at least before

argument.  Lenovo seeks to cut off that possibility, and risks depriving this Court of a complete presentation of the issues before it.

## BACKGROUND

A "major player[] in the mobile telecommunications industry," Dkt.71 at 2 ("Op."), Ericsson has spent decades developing innovative technologies to make cellular communications faster, more reliable, and more secure, Dkt.1 ¶¶21-26.[1]  As a member of the European Telecommunications Standards Institute ("ETSI"), Ericsson has been a leading contributor of technologies to the 2G, 3G, 4G, and 5G standards used by cell phones and networks worldwide, and holds patents on many technologies included in the standards.  *Id.*  Under ETSI's auspices, Ericsson has contractually committed to be prepared to grant licenses to its SEPs on FRAND terms.  Op.4.  Consistent with that commitment, Ericsson has licensed its SEPs to scores of companies.  *Id.*

## I.    LENOVO PROFITS FROM INFRINGING ERICSSON'S SEPS FOR OVER A DECADE WHILE REFUSING TO LICENSE THEM

Lenovo is also an ETSI member that has contributed patented technologies to ETSI standards and holds alleged SEPs covering its contributions.  Op.3.  After acquiring Motorola in 2014, Lenovo became the world's "#3 Smartphone Maker." Dkt.1 ¶66.  Along with Ericsson and other ETSI members, Lenovo is part of an

---

[1] "Dkt." citations are to the district-court docket, E.D.N.C., No. 5:23-cv-00569.

international consortium, the Third Generation Partnership Project ("3GPP"), that developed the standard for 5G, the successor to 4G. Op.3. In March 2017—before the 5G standard was finalized—Ericsson announced that it intended to license its 5G SEPs at $5 per handset. Op.5; Dkt.1 ¶50. As a 3GPP member, Lenovo, along with the rest of the industry, later approved the 5G standard. Dkt.1 ¶¶51-52; Dkt.48-17 at 1, 9.

Nonetheless, Lenovo has, for over a decade, refused to license Ericsson's SEPs. Op.5. Ericsson began licensing discussions with Lenovo, for Ericsson's 2G and 3G SEPs, in 2008. Dkt.1 ¶54. Lenovo refused to take a license, insisting that Ericsson could not successfully enforce its patents against Lenovo. *Id.* ¶65. After Lenovo purchased Motorola in 2014, Ericsson spent four more years unsuccessfully negotiating with Lenovo. *Id.* ¶¶66-77.

Ericsson and Lenovo first discussed licensing Ericsson's 5G SEPs in 2018. Dkt.1 ¶76; *see* Op.5. Lenovo did not take a 5G license, but launched 5G devices using Ericsson's technology in 2019. Dkt.1 ¶¶75-77. In 2021, the parties' most recent non-disclosure agreement ("NDA")—necessary to allow meaningful negotiations—expired. *Id.* ¶78. Lenovo, however, refused to sign an industry-standard NDA, or even renew the NDA it had previously accepted. *Id.* ¶¶86-88. Instead, it demanded an NDA it knew Ericsson could not accept: one that would allow it to share Ericsson's confidential information with third parties and limit

**CONFIDENTIAL MATERIAL OMITTED ON THIS PAGE**

Ericsson's rights to enforce its patents, while allowing Lenovo to sue Ericsson in China. *Id.* ¶89. Negotiations **over the NDA** continued for more than two years. *Id.* ¶¶ 78-90.

## II. ERICSSON AND LENOVO INITIATE GLOBAL LITIGATION AS LENOVO SPURNS ERICSSON'S FRAND OFFER

On October 11, 2023, Ericsson sent a letter informing Lenovo that, because Lenovo had refused to take a license for "over a decade," Ericsson was filing suit. Dkt.47-7 at 1. The same day, Ericsson sued Lenovo in the Eastern District of North Carolina, where Lenovo has its U.S. headquarters. Op.6; p. 7, *infra*.

### A. Ericsson's Offer to Lenovo of License Terms Accepted by Others

Ericsson's letter nonetheless made one last-ditch effort to avoid litigation. Ericsson offered Lenovo a license to Ericsson's 5G SEPs at 1% per 5G device, with a cap of $4. Op.5. That is equivalent to the rate other phone makers, such as Licensee, have accepted. Dkt.43-3 at 4-5 ("Ex.B"). And in *HTC Corp. v. Telefonaktiebolaget LM Ericsson*, 12 F.4th 476 (5th Cir. 2021), the Fifth Circuit affirmed a jury verdict finding that rate to be FRAND for Ericsson's less-advanced **4G** technology. Ericsson also gave Lenovo 30 days to agree to binding arbitration in which the parties could determine any other disputed license terms. Dkt.47-7 at 1. Lenovo never engaged with that offer.

### B.    Ericsson's Eastern District of North Carolina Proceeding

Alleging that Lenovo had breached its contractual obligation to negotiate in good faith, Ericsson sought a declaration that Ericsson had complied with its own contractual obligations because its October 11 offer was FRAND.  Op.6.  Ericsson also asserted infringement claims.  Op.6.  In December 2023, Lenovo filed counter-claims alleging Ericsson had breached its contractual FRAND commitment and that it infringed Lenovo's alleged SEPs, and asked the district court to declare FRAND royalty rates for Ericsson's 5G SEPs.  Op.6.

### C.    Lenovo's U.K. Proceedings

On October 13, 2023—two days after Ericsson's letter—Lenovo sued Ericsson in the High Court of England and Wales.  Op.6.  Lenovo accused Ericsson of infringing an alleged Lenovo 5G SEP and sought a determination of FRAND terms for a global cross-license.  Op.6-7.  In December 2023, Lenovo amended its complaint to request an injunction.  Op.6-7.  Lenovo then filed another U.K. suit accusing Ericsson of infringing other alleged SEPs and seeking a preliminary injunction.  Dkt.70.

### D.    Ericsson's Brazil Proceeding

After Lenovo took no action on Ericsson's arbitration offer, on November 21, 2023, Ericsson sued Lenovo for patent infringement in Brazil, where Lenovo makes a large number of infringing sales.  Op.8.  Brazilian law makes injunctions the primary remedy for patent infringement and provides damages only for infringement

that "could not be prevented with a preliminary injunction." Dkt.47-3 ¶6. Ericsson thus sought a preliminary injunction against Lenovo's infringement in Brazil.

While Lenovo says the proceedings were "secret," Mot.2, they were public until Lenovo requested them to be sealed, 1/11/2024 Tr. ("Ex.A") at 50:17-51:12. Lenovo appeared and opposed Ericsson's injunction request. Lenovo asserted that Ericsson had failed to make Lenovo a FRAND offer, Dkt.48-20 at 5, and accused Ericsson of trying to "coerc[e]" Lenovo into settling; Lenovo thus urged the court to deny the injunction until the U.K. court could declare a FRAND rate, *id.* at 4-9. The Brazilian court rejected Lenovo's arguments and, finding Ericsson had made a sufficient showing of infringement, issued a preliminary injunction. Dkt.47-3 ¶28-29.

On December 10, 2023, Lenovo appealed and sought a stay pending appeal. Dkt.47-3 ¶¶32-35. Lenovo argued that an injunction was inappropriate because the U.S. or U.K. proceedings would determine the FRAND rate. Dkt.48-21 at 7-8. The appellate court denied a stay, and Lenovo's motion for reconsideration. Dkt.47-3 ¶¶36-38. Brazilian appeals are typically resolved in about 75 days, so a decision in Lenovo's appeal is likely imminent. *Id.* ¶39.

### E.    Ericsson's Colombia Proceedings

On November 20, 2023, Ericsson sued Lenovo in Colombia for infringement of Ericsson's 5G SEPs in Colombia. In Colombia, as in Brazil, injunctions are the

"primary remedy" for patent infringement.  Dkt.47-4 ¶6.  Under Colombian law, a plaintiff typically seeks preliminary injunctions *ex parte*, but the tribunal must find a likelihood of infringement.  *Id.* ¶¶6-7.  No injunction will issue unless the plaintiff posts a bond adequate to "cover the potential damages to the defendant should the plaintiff fail on the merits."  *Id.* ¶7.  Then, the defendant can intervene and seek reconsideration.  *Id.*

The Colombian Superintendence of Industry and Commerce ("SIC") found a likelihood of infringement and, once Ericsson posted the required bond, issued a preliminary injunction on December 12, 2023.  Dkt.47-4 ¶¶12-13.  Despite knowing of the SIC proceedings, Ex.A at 53:18-54:2, Lenovo never intervened or sought reconsideration, Dkt.47-4 ¶¶8, 17-19.  Instead, it pursued a direct appeal in the Superior Tribunal of Bogota.  That appeal is expected to be resolved within six to eight months, *i.e.*, around July 2024.  Ex.A at 19:22-24.

## III.   LENOVO'S MOTION FOR AN ANTISUIT INJUNCTION DIRECTED TO THE ERICSSON-INITIATED SOUTH AMERICAN PROCEEDINGS

### A.   Lenovo Demands That the District Court Issue an Antisuit Injunction Interfering with Foreign Suits Involving Foreign Patents

On December 29, 2023, Lenovo moved the North Carolina court for an antisuit injunction barring enforcement of the Brazilian and Colombian injunctions (but not its own demand for injunctive relief in the U.K.).  Lenovo acknowledged the "threshold requirement" for an injunction against foreign proceedings—that the

U.S. suit "will be dispositive of the foreign suits." Dkt.40 at 15. It urged that requirement was met because, if the parties were to reach a global license due to the North Carolina case, that would resolve the Brazilian and Colombian suits. *Id.*

Lenovo acknowledged that, even if that threshold requirement is met, U.S. courts should not interfere with foreign proceedings unless those proceedings "would '(1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's ... jurisdiction; [or] (4) prejudice other equitable considerations.'" Dkt.40 at 16-17. Lenovo argued that Ericsson's South American suits frustrate a supposed U.S. policy against patentees obtaining injunctions in foreign courts for foreign patents subject to FRAND commitments. *Id.* at 17-18. Lenovo did not mention that *it* was seeking injunctions in the U.K. concerning *its own* alleged 5G SEPs.

Lenovo urged that the South American suits threatened the North Carolina court's "jurisdiction." Dkt.40 at 18-19. Lenovo invoked the possibility that it might take a license from Ericsson and settle the North Carolina suit to resolve the foreign injunctions. *Id.* Lenovo did not allege it faced financial distress from the injunctions that could force it to capitulate.

Lenovo also urged that Ericsson's Brazilian and Colombian suits were "vexatious." Dkt.40 at 20. Lenovo did not mention that injunctions are the primary

remedy for patent infringement in those countries and, indeed, a prerequisite to damages in Brazil. *See* pp. 7-9, *supra*.

### B.     The District Court Denies Lenovo's Requested Injunction

The district court denied the requested antisuit injunction. It observed that Lenovo faced an extraordinarily high burden. An injunction is an "extraordinary remedy never awarded as of right." Op.11 (quoting *Winter v. NRDC*, 555 U.S. 7, 24 (2008)). The "extraordinary nature" of injunctions is "heightened" when a party seeks to enjoin foreign proceedings, because an antisuit injunction "'effectively restricts the jurisdiction of the court of a foreign sovereign.'" *Id.* (quoting *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 35 (2d Cir. 1987)).

The court turned to the "threshold requirement[]" for an antisuit injunction—that "resolution of the case before the enjoining court [will be] dispositive of the action to be enjoined"—and found that requirement unmet here. Op.12. Ericsson had asked the district court to decide, at the threshold, whether its offer of 1% with a $4 cap was FRAND. Op.16. "Lenovo," however, "has neither committed to accepting Ericsson's offer if it is FRAND nor would it be forced to." Op.16. Unless Lenovo agreed to be so bound, the court explained, the court's determination would not necessarily result in a "global licensing agreement that would resolve . . . the Brazilian and Colombian actions." Op.17.

This case thus differed significantly from *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012), on which Lenovo relied.  Op.17.  There, unlike here, the parties had agreed to have the court "craft" a license "agreement" for the parties that would have resolved the foreign actions.  *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1038 (9th Cir. 2015); *see* Op.17.  Having found that Lenovo's antisuit injunction request failed at the threshold, the court did not need to address international comity or other relevant factors.  Op.12-13.

## C.    Lenovo Appeals and Moves To Expedite

Lenovo waited nine days to appeal, until February 23, 2024.  Dkt.80.  Lenovo then filed this motion to expedite, which proposes that its opening brief be due March 22, 2024; Ericsson's response be due May 1, 2024; and Lenovo's reply and the Joint Appendix be due May 15, 2024.  Mot.1.  Lenovo requests argument in July.  *Id.*  It also proposes that the Court preemptively bar any extensions.  *Id.*

## ARGUMENT

"[M]otions to expedite proceedings are not routinely granted."  Fed. Cir. Practice Notes to R. 27.  Expedition departs from this Court's ordinary case-management practices and allows parties to leapfrog over other litigants with earlier-filed appeals.  Accordingly, expedition is "appropriate" only "where the normal briefing and disposition schedule may adversely affect one of the parties."  *Id.*  Courts thus deny expedition unless the movant demonstrates (1) it confronts irreparable harm

absent expedition, and (2) that expedition might redress that harm by advancing a meritorious appeal. That means proof that "delay will cause irreparable injury ***and*** that the decision under review is subject to substantial challenge." *Purepac Pharm. Co. v. Thompson*, No. 02-5410, 2003 WL 174023 (D.C. Cir. Jan. 21, 2003) (emphasis added); *see LeBoeuf, Lamb, Greene & MacRae, L.L.P v. Abraham*, No. 02-5265, 2003 WL 21384634 (D.C. Cir. May 28, 2003); D.C. Cir. Handbook of Prac. and Internal Proc. 33; 9th Cir. R. 27-12 (must show "irreparable harm").

Lenovo's demand for urgency is based on a Twilight Zone version of the facts. Lenovo portrays itself as a diligent potential licensee seeking repose to negotiate a FRAND license; it urges that such things "take time." Mot.4. But Lenovo omits that, for over a decade, it has refused to take a license at rates others have agreed to pay, concededly infringing year after year. It does not mention that, for years now, it has refused even to sign an NDA to facilitate negotiations. Lenovo decries the effect of foreign injunctions, but overlooks its own pursuit of an injunction against Ericsson abroad. Lenovo characterizes the Brazilian and Colombian injunctions as draconian remedies issued in "secret" proceedings. But it fails to mention that it appeared in and asked to seal the Brazilian proceeding, raised many of the arguments it raises here, but did not persuade the court. Lenovo ignores that it had the right to intervene in the Colombian proceeding but chose not to do so. And Lenovo ignores

that injunctions are the preferred remedy for patent infringement in those two countries—and a condition precedent to damages in one.

Lenovo presents no basis for allowing it to cut to the front of the line on appeal. Lenovo's concern that the foreign injunctions might lessen its negotiating leverage in the U.S. (perhaps prompting it to accept Ericsson's offer) is not irreparable harm; and Lenovo filed its own foreign suits to pressure Ericsson. Lenovo, moreover, does not attempt to show its appeal raises substantial issues. That is fatal as well. There is no reason to expedite an appeal that will invariably result in affirmance.

Lenovo is free to file its own briefs early—as this Court has already ordered. ECF #10. But Lenovo cannot justify the prejudice to other litigants waiting ahead of it in the oral argument queue. Nor can Lenovo justify preemptively denying Ericsson *any* possible extension. The motion should be denied.

## I.    LENOVO FAILS TO SHOW IRREPARABLE HARM

### A.    Alleged "Pressure" To Settle Is Not Irreparable Harm

Lenovo's motion addresses irreparable harm in just two pages, without citing a single authority. Mot.12-13. It urges that, absent expedition, "Lenovo will be irreparably harmed *if*," due to "Ericsson's foreign injunctions," it takes a license and "drop[s]" its suits seeking a determination of "FRAND terms." Mot.12 (emphasis

added). Lenovo's brief, however, nowhere explains how the hypothetical prospect of Lenovo voluntarily settling this litigation constitutes cognizable irreparable harm.

1.    Lenovo does not argue that the foreign injunctions create such financial distress that it has ***no choice*** but to take a license and abandon this suit. Lenovo is one of the world's largest companies, with revenues exceeding ***$61 billion*** in 2023.[2] The prospect of the injunctions forcing Lenovo to settle—much less doing so before this appeal would be resolved in the ordinary course—is the sort of "speculative" consequence that cannot constitute irreparable harm. *Koninklijke Philips N.V. v. Thales DIS AIS USA LLC*, 39 F.4th 1377, 1380 (Fed. Cir. 2022).

Moreover, Lenovo's speculation that it might make the ***business decision*** to settle due to "pressure" from the injunctions, Mot.3, is not irreparable harm, *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017). Lenovo ignores that it has sought to pressure Ericsson by refusing to license for years, and by seeking an injunction in the U.K. That theoretically could cause Ericsson to agree to a less-than-FRAND rate. But the law does not make such ordinary pressures irreparable harm, much less deem one permissible and the other not.

Courts thus have rejected such arguments. In *Ericsson Inc. v. Apple Inc.*, No. 21-cv-00376, 2022 WL 19403865 (E.D. Tex. 2022), a similarly deep-pocketed

---

[2] Lenovo Earnings: Q3 2023/2024 (Feb. 22, 2024), https://news.lenovo.com/pressroom/press-releases/q3-fy-2023-24/.

infringer urged it faced "'irreparable injury'" because a foreign "'injunction'" gave the patentee greater negotiating "'leverage.'" *Id.* at *2. The court disagreed, because the injunctions did not threaten the infringer's "ability to proceed with the instant case." *Id.* at *4. Likewise here, Lenovo cannot credibly assert that it would be forced to settle. And a garden-variety business decision to settle cannot constitute irreparable harm.

2.    Cognizable "harm," moreover, must "result" from another party's "wrongful conduct." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 640 (Fed. Cir. 2015). Here, the injunctions arise from ***Lenovo's*** wrongdoing. It sells infringing devices in Brazil and Colombia, where the patent system prefers to halt ongoing infringement rather than allowing it to continue and awarding damages after-the-fact. *See* pp. 7-9, *supra*. Lenovo ignores those jurisdictions' laws. It faces only those countries' standard consequences for its infringement.

Lenovo denounces the Brazilian and Colombian proceedings as "secret" and "*ex parte*." Mot. 2. But Lenovo appeared in Brazil, filed briefs in opposition, and requested the case be sealed. Op.8. It raised the same arguments Lenovo presented below: that Ericsson has not made a FRAND offer, and that an injunction should not be issued while the U.S. or U.K. courts determine the FRAND rate. Dkt.48-20; Dkt.48-21. The Brazilian court issued the injunction anyway. *See* p. 8, *supra*.

16

Meanwhile, in Colombia, Lenovo had the right to intervene in the SIC, which issued the injunction. Dkt.47-4 ¶7. But Lenovo *declined*, and instead pursued an appeal. *Id.* Lenovo's claim of irreparable harm from the Colombian proceedings is particularly feeble, given that Ericsson has posted a bond to cover harm to Lenovo if the injunction is later overturned. *Id.* ¶11.

### B.    Lenovo's Conduct Belies Any Urgency

Lenovo's demand for urgency is belied by its own conduct. Lenovo never sought to expedite the district-court proceedings. It waited more than a month after the Brazilian injunction, and more than two weeks after the Colombian injunction, to file its "emergency" antisuit-injunction motion. Lenovo then waited nine days to appeal the denial of its motion. Even now, Lenovo is content waiting at least four months for argument, and longer still for disposition. Plainly, there is no emergency that justifies cutting off the possibility of Ericsson seeking even a short extension.

Attempting to seize the equities, Lenovo suggests the injunctions are unnecessary because it has offered "interim royalty payments." Mot.8. Not so: Lenovo offered to pay into escrow *on the condition* that Ericsson (1) agree to proceed in *Lenovo's preferred U.K. forum*, (2) drop all other litigation, (3) consent to the U.K. court establishing a FRAND rate without deciding whether Ericsson's offer was FRAND, and (4) include non-SEPs (not at issue here) in any license. *See* Dkt.37-13 at 2; Dkt.37-19; Dkt.47-11.

Lenovo is subject to the foreign injunctions because it refused to take a license for *a decade*. Courts in Brazil and Colombia saw fit to grant an injunction against that long-ongoing infringement. It is the height of irony for Lenovo to now demand that this Court shove earlier-filed cases aside so Lenovo can rush its (doomed, *see* pp. 18-22, *infra*) effort to obtain relief from those injunctions.

## II.    LENOVO LACKS A MERITORIOUS APPEAL

Parties seeking expedition must show irreparable harm *and* a "substantial challenge" on the merits. *Purepac*, 2003 WL 174023, at *1; *see LeBoeuf*, 2003 WL 21384634, at *1. That makes sense: Parties are not "adversely affected" by delay, Fed. Cir. Practice Notes to R. 27, if the result is inevitable affirmance. But Lenovo barely mentions the merits.

### A.    Lenovo Fails To Show a Substantial Issue on Appeal

Lenovo's failure to meaningfully address the many daunting hurdles it faces is telling. It must show the district court's *denial* of an antisuit injunction—its refusal to interfere with foreign proceedings—is an abuse of discretion. Op.11. An injunction should be granted only in "extraordinary" circumstances. *Winter*, 555 U.S. at 24. Where the requested injunction would interfere with "the jurisdiction of the court of a foreign sovereign," the hesitancy to issue an injunction is "heightened." Op.11. And this Court reviews denial of a preliminary injunction under the highly

deferential abuse-of-discretion standard.  *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997).

Lenovo nowhere denies that, for an antisuit injunction to properly issue, the "resolution of the case before the enjoining court" ***must*** be "***dispositive*** of the action to be enjoined."  Op.12 (emphasis added).  But the district court correctly found the North Carolina action would ***not*** necessarily dispose of the Brazilian and Colombian actions.  Op.12.  The reason:  "Lenovo has [not] committed to accepting Ericsson's offer" even if the district court rules the offer was "FRAND."  Op.16.  Even if the court finds Ericsson's offer was FRAND, Lenovo could still refuse a license and continue infringing, in which case the Brazilian and Colombian actions would indisputably be proper.  Op.16.

Lenovo does not address the district court's determination that Lenovo's own refusal to be bound precludes its request for antisuit relief.  Lenovo does not dispute the court's observation that determining a FRAND rate would not, by itself, create a license agreement.  Op.16-17.  Nor does Lenovo commit to accepting Ericsson's offer if the district court declares it to be FRAND.  Op.16.

In the background section of its brief, Lenovo cites *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012), and *Huawei Technologies, Co. v. Samsung Electronics Co.*, No. 16-cv-02787, 2018 WL 1784065 (N.D. Cal. Apr. 13, 2018).  Mot.9.  Those cases are far afield.  As the district court explained, in

*Microsoft*, the FRAND determination would be dispositive: The parties agreed to have the court determine license terms, so there was no possibility a party could refuse to be bound by the court's ruling. Op.17; *see* 795 F.3d at 1038. *Huawei* also did not address U.S. litigation that might not be dispositive of foreign cases because a party refused to be bound by the result.

The *Microsoft* and *Huawei* courts, moreover, had before them the issue whether injunctive relief was *per se* incompatible with FRAND commitments. *See Microsoft*, 696 F.3d at 886; *Huawei*, 2018 WL 1784065, at *6 & n.15. Resolution of *that* issue arguably would have been dispositive of the foreign proceedings: If FRAND commitments preclude injunctions, that might have resolved the propriety of foreign proceedings seeking injunctions. *Microsoft*, 696 F.3d at 884. But, after *Microsoft*, this Court rejected any "rule" against "injunctions for FRAND-committed patents," and held that "an injunction may be justified where an infringer unilaterally refuses a FRAND royalty or unreasonably delays negotiations to the same effect," *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1332 (Fed. Cir. 2014)— as Lenovo has done here.

When ETSI considered adding language to its Intellectual Property Rights Policy to restrict the availability of injunctions, it declined to do so. Dkt.48-18 at 116-21. Instead, ETSI leaves remedies for infringement of SEPs to domestic law.

*Id.* Brazil's and Colombia's domestic laws permit injunctions for infringement of SEPs issued by those countries. *See* pp. 7-9, *supra*.

Unlike the parties in *Microsoft* and *Huawei*, Lenovo concedes injunctions are available for SEPs subject to FRAND commitments. *See* Dkt.53 at 5 (citing *Apple*, 757 F.3d at 1332). And Lenovo *itself* has sought injunctive relief with respect to *Lenovo* patents it asserts as SEPs. Op.7.

## B. Lenovo Cannot Show the District Court Would Be Justified in Interfering with Foreign Proceedings

Lenovo's proposed injunction presents a serious affront to international comity, which "ordinarily requires that courts of a separate sovereign not interfere with concurrent proceedings" in the courts of other sovereigns. *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 939 (D.C. Cir. 1984). Lenovo asks a U.S. court to interfere with injunctions issued by courts in Brazil and Colombia, pursuant to their patent systems' ordinary rules, against infringement in those countries of patents issued by those countries.

Lenovo presented no compelling reason for the U.S. court to intervene. Lenovo suggested the U.S. has a "policy" against injunctions for SEPs subject to FRAND commitments. Dkt.40 at 17-18. But this Court and the U.S. government have disagreed, explaining that "an injunction may be justified where an infringer . . . unreasonably delays negotiations" for a license. *Apple*, 757 F.3d at 1332 (citing DOJ-USPTO policy statement). That perfectly describes Lenovo, which has refused

to license Ericsson's SEPs for *a decade*, while profiting from using Ericsson's SEPs. Nor could such an argument be reconciled with Lenovo having sought injunctions for its *own* alleged SEPs.  Op.7.

Lenovo shows no "threat[ ]" to the U.S. court's "jurisdiction."  Dkt.40 at 16-17.  Even assuming the foreign injunctions might incline Lenovo toward accepting Ericsson's offer, that would have no bearing on the U.S. court's *jurisdiction*.  *See Ericsson*, 2022 WL 19403865 at *4.  It would simply mean the case might be resolved by settlement rather than litigation.  That is routine—indeed, encouraged. Fed. Cir. R. 33 ("Parties are encouraged . . . to attempt settlement").  Lenovo's desire to be free of external incentives to settle—while pressuring Ericsson to settle by pursuing its own foreign suits—does not remotely justify intruding on Brazil's and Colombia's application of their own patent laws, on patents they issued, to conduct within their borders.  Nor can that desire justify Lenovo's jumping to the front of the line in this Court.

## III.    EXPEDITING THIS APPEAL WOULD EXACERBATE THE INTRUSION INTO FOREIGN PROCEEDINGS AND DEPRIVE THIS COURT OF A FULL RECORD

Expedition is especially inappropriate given the pending appeals in Brazil and Colombia, where Lenovo raises many of the arguments it asserts here.  Lenovo's Brazilian appeal, for example, asserts that Ericsson sought injunctions to "pressure and coerce Lenovo" into taking a license on non-FRAND terms.  Dkt.48-21 at 8.  It urges the court to vacate the injunction, and "wait[ ]" for the U.S. or U.K. courts to

"determine the terms of a global cross-license." *Id.* And, like its expedition motion, Mot.13, it invokes supposed harm to "Brazil's local economy." Dkt.48-21 at 12. The appellate courts of Brazil and Colombia thus will decide whether their ordinary injunctive procedures should be set aside in these circumstances.

A decision in the Brazilian appeal is imminent, and Lenovo expects its Colombian appeal to be decided between June and August. *See* p. 9, *supra.* Under a normal briefing schedule, Ericsson likely could address both in its response brief. But under Lenovo's proposed schedule, Ericsson's brief would be due May 1 and argument would be held in July. Mot.1. That likely would preclude Ericsson's response brief from addressing any decision in the Colombia appeal, and may preclude any submission addressing that decision before argument. Lenovo thus seeks not only to have this Court interfere with foreign proceedings. Its request to expedite risks depriving this Court of the benefit of relevant foreign decisions.

At best, Lenovo's demand to cut off extensions is premature. Lenovo should raise its opposition to an extension if and when Ericsson seeks one.

## CONCLUSION

Lenovo's motion should be denied.

March 11, 2024                     Respectfully submitted,


                                   /s/ Jeffrey A. Lamken

Theodore Stevenson, III            Jeffrey A. Lamken
ALSTON & BIRD LLP                     *Counsel of Record*
Chase Tower, Suite 2300            Rayiner Hashem
2200 Ross Avenue                   Lucas M. Walker
Dallas, TX  75201                  Caleb Hayes-Deats
(214) 922-3400 (telephone)         Kayvon Ghayoumi
ted.stevenson@alston.com           MOLOLAMKEN LLP
                                   The Watergate, Suite 500
Blake H. Bailey                    600 New Hampshire Avenue, N.W.
MCKOOL SMITH, P.C.                 Washington, D.C.  20037
600 Travis Street, Suite 7000      (202) 556-2000 (telephone)
Houston, TX  77002                 jlamken@mololamken.com
(713) 485-7300 (telephone)
bbailey@mckoolsmith.com            Catherine Martinez
                                   MOLOLAMKEN LLP
Nicholas M. Mathews                430 Park Avenue,
Alexander J. Chern                 New York, NY  10022
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1200
Dallas, TX  75201


                *Counsel for Appellees*

**FORM 31. Certificate of Confidential Material**

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2024-1515

**Short Case Caption:** Telefonaktiebolaget LM Ericsson v. Lenovo (United States), Inc.

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ___1___ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 03/11/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2024-1515

**Short Case Caption:**  Telefonaktiebolaget LM Ericsson v. Lenovo (United States), Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  5,169  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 03/11/2024

Signature:  /s/ Jeffrey A. Lamken

Name:  Jeffrey A. Lamken

# EXHIBITS

## **TABLE OF EXHIBITS**

Exhibit A – Transcript of Proceedings Held on January 11, 2024 (E.D.N.C. Dkt. 56)

Exhibit B – Declaration of Robert Mills in Support of Ericsson's Opposition to Lenovo's Motion for Preliminary Injunction (E.D.N.C. Dkt. 43)

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

TELEFONAKTIEBOLAGET LM          )
ERICSSON,                       )
                                )
            *Plaintiff*,         )          Case No.
        v.                      )    5:23-CV-00569-BO-RJ
                                )
LENOVO (UNITED STATES),         )
INC., et al.,                   )
                                )
            *Defendant*.         )

        * * * * * * * * * * * * * * * * * * * * * * * * * * *

THURSDAY, JANUARY 11, 2024
MOTION HEARING
BEFORE THE HONORABLE TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

On Behalf of the Plaintiff:

Theodore Stevenson, III, Esquire
Alston & Bird, LLP
2200 Toss Avenue, Suite 2300
Dallas, Texas 75202
(214) 922-3507 │ ted.stevenson@alston.com

Thomas G. Walker, Esquire
Alston & Bird, LLP
Bank of America Plaza, 101 South Tryon Street Suite 4000
Charlotte, North Carolina 28280-4000
(919) 862-2212 │ thomas.walker@alston.com

Nicholas M. Mathews, Esquire
McKool Smith
300 Crescent Court, Suite 1500
Dallas, Texas 75201
(214) 978-4914 │ nmathews@mckoolsmith.com

JENNIFER C. CARROLL, RMR, CRR, CRC
Official Court Reporter
United States District Court
Raleigh, North Carolina

On Behalf of the Defendant:

Gregory S. Arovas P.C., Esquire
Leslie M. Schmidt, P.C., Esquire
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4766 | greg.arovas@kirkland.com
(212) 446-4763 | leslie.schmidt@kirkland.com

Raymond M. Bennett, Esquire
Womble Bond Dickson (US), LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
(919) 755-2158 | ray.bennett@wbd-us.com

|  |  |  |
|--|--|--|
| | 1 | (Thursday, January 11, 2024, at 1:59 p.m. |
| | 2 | Elizabeth City, N.C.) |
| | 3 | **P R O C E E D I N G S** |
| 13:59:20 | 4 | THE COURT:  Good afternoon.  We're here on |
| 13:59:32 | 5 | the defendant's motion for injunction, and I'll hear |
| 13:59:39 | 6 | from the defendant at this point. |
| 13:59:44 | 7 | MR. AROVAS:  Thank you, Your Honor.  Gregory |
| 13:59:47 | 8 | Arovas from Kirkland & Ellis representing defendant |
| 13:59:51 | 9 | Lenovo and Motorola Mobility.  May I proceed? |
| 13:59:54 | 10 | THE COURT:  Yes, please. |
| 13:59:54 | 11 | MR. AROVAS:  Thank you, Your Honor. |
| 13:59:56 | 12 | So Lenovo's motion seeks a narrowly tailored |
| 14:00:01 | 13 | injunction prohibiting Ericsson from enforcing certain |
| 14:00:06 | 14 | foreign preliminary injunctions that would interfere |
| 14:00:10 | 15 | with this Court's adjudication of certain contract |
| 14:00:14 | 16 | issues, contract claims that are currently pending |
| 14:00:17 | 17 | before the Court.  In essence, what we're seeking to do |
| 14:00:21 | 18 | is to preserve the status quo between the parties |
| 14:00:25 | 19 | commercially while the Court has an opportunity to |
| 14:00:28 | 20 | address the first-filed issues, contract issues, that |
| 14:00:32 | 21 | are pending before the Court right now. |
| 14:00:34 | 22 | THE COURT:  How old are these rulings in |
| 14:00:37 | 23 | Colombia and Brazil?  How recent are they? |
| 14:00:41 | 24 | MR. AROVAS:  In December. |
| 14:00:42 | 25 | THE COURT:  Okay. |

14:00:42  1          MR. AROVAS:  December of last year.

14:00:44  2          Your Honor, I actually have some slides that

14:00:46  3  have some diagrams, timelines, things like that.  I can

14:00:50  4  hand them up to Your Honor if you think they might be

14:00:52  5  beneficial.  I'm not going to walk through the slides,

14:00:54  6  but it may be useful --

14:00:55  7          THE COURT:  You can hand them in.

14:00:57  8          MR. AROVAS:  Thank you.

14:01:02  9          (Notebook handed to the Court.)

14:01:12  10          MR. AROVAS:  And since Your Honor was asking

14:01:15  11  about the timing of all of this, if Your Honor turns to

14:01:20  12  slide 11 -- my apologies, 13.  This has a timeline of

14:01:43  13  the different actions that are going on around the world

14:01:48  14  in one place.  So, at the top, you have North Carolina

14:01:52  15  action -- this action -- which was filed on

14:01:58  16  October 11th.  The Colombia and Brazilian actions, which

14:02:01  17  are the actions that resulted in injunctions that are

14:02:05  18  the focus of this motion.  Colombia is a series of 26

14:02:10  19  ex parte PIs against Lenovo and its customers that were

14:02:16  20  filed between November 20th and December 1st.

14:02:19  21          Now, three of those have issued -- we don't

14:02:23  22  know -- since all are ex parte, we don't know everything

14:02:25  23  going on there.  We know about these 26.  And three of

14:02:29  24  them have issued injunctions -- one against Lenovo, two

14:02:33  25  against Lenovo customers -- for selling Lenovo product.

14:02:37 1   Then, in addition to the 26 actions in Colombia, there's

14:02:42 2   an action in Brazil on two of these essential patents.

14:02:48 3   That was filed on November 21st.  And that PI issued on

14:02:55 4   November 27th.  That gives Your Honor kind of a general

14:02:59 5   timeline of the relative position of the different

14:03:01 6   actions.

14:03:02 7           THE COURT:  Right.

14:03:02 8           MR. AROVAS:  Now, the contracts -- I mention

14:03:05 9   this is a contract case.  Right?  The contract at issue

14:03:09 10  relates to an irrevocable obligation that both parties

14:03:13 11  made to each other -- actually, they made to the world,

14:03:16 12  to grant licenses to patents that are essential to being

14:03:22 13  able to use certain public cellular standards.  These

14:03:26 14  are referred to in the brief as "5G SEPs."

14:03:31 15          So the 5G piece of that is referring to the

14:03:33 16  fifth generation cellular standard, which is the current

14:03:36 17  generation that is rolling out now.  They actually come

14:03:40 18  generations 2G, 3G, 4G.  And they're spaced roughly, I

14:03:45 19  would say, five to six years apart from each other.  And

14:03:51 20  their SEPs are -- the acronym SEP refers to "standard

14:03:56 21  essential patent."  Basically, that refers to patents

14:03:58 22  that are necessary to be able to use and implement this

14:04:03 23  5G public standard.

14:04:05 24          And so both parties, there's actually a --

14:04:09 25  I'll talk about the standard setting a little bit later.

14:04:12  1   But both parties make irrevocable commitments to license

14:04:15  2   the essential patents that they have to the other party

14:04:18  3   and to the rest of the world, anybody who wants to

14:04:20  4   practice this standard.  And there's no dispute that

14:04:24  5   both parties are obligated to do so.  That's actually in

14:04:28  6   counts for both Ericsson and Lenovo currently pending

14:04:32  7   before the case.

14:04:34  8           There's no dispute -- and this is actually

14:04:36  9   very important -- that this single contract -- this

14:04:39  10   single contractual obligation applies to all worldwide

14:04:42  11   patents.  So it's not a obligation to license in country

14:04:47  12   A or country B; it's an obligation to license all of

14:04:50  13   your patents worldwide that may be relevant and

14:04:53  14   necessary to practice the standard.  And there's no

14:04:57  15   dispute -- this is also important -- that the parties

14:05:00  16   don't get to unilaterally set the price for the rates.

14:05:04  17   That the commitment and the obligation that's made to

14:05:07  18   license is to license under fair, reasonable, and

14:05:12  19   nondiscriminatory rates.  So nondiscriminatory between

14:05:16  20   similarly situated parties, fair and reasonable, and

14:05:19  21   that is kind of an overarching constraint on the amount

14:05:24  22   companies can charge.

14:05:25  23           Now, what is the dispute here that's pending

14:05:28  24   before Your Honor?  It basically is an issue of price.

14:05:32  25   Everybody agrees it's a contract.  Everybody agrees the

| | | |
|---|---|---|
| 14:05:35 | 1 | contract covers the worldwide patent portfolio.  What |
| 14:05:39 | 2 | the parties don't agree on is what is this fair, |
| 14:05:43 | 3 | reasonable, and nondiscriminatory price. |
| 14:05:45 | 4 | THE COURT:  Who is supposed to reconcile |
| 14:05:47 | 5 | that? |
| 14:05:47 | 6 | MR. AROVAS:  So the courts can do it or the |
| 14:05:50 | 7 | parties can do it through negotiation.  So one of the |
| 14:05:54 | 8 | things that's sort of a unique feature of the standard |
| 14:05:59 | 9 | setting bodies is you have actually horizontal |
| 14:06:01 | 10 | competitors that come together and -- collectively to |
| 14:06:04 | 11 | set the standard and set the technology going forward. |
| 14:06:07 | 12 | They don't negotiate price.  They don't talk about price |
| 14:06:10 | 13 | in these meetings.  They set the standards.  They set |
| 14:06:14 | 14 | the technology.  And the standards bodies have rules to |
| 14:06:17 | 15 | say, okay, while all of these horizontal competitors |
| 14:06:21 | 16 | can't talk about price, we're going to have an |
| 14:06:23 | 17 | overarching rule that whatever price, it has to be fair, |
| 14:06:28 | 18 | reasonable, and nondiscriminatory, and we're going to |
| 14:06:30 | 19 | leave it to the courts and the parties to determine. |
| 14:06:32 | 20 | THE COURT:  Leave it to the courts? |
| 14:06:33 | 21 | MR. AROVAS:  And the parties, yes. |
| 14:06:34 | 22 | THE COURT:  To set prices? |
| 14:06:35 | 23 | MR. AROVAS:  Yes. |
| 14:06:35 | 24 | THE COURT:  The whole purpose of being in |
| 14:06:37 | 25 | business is to make money. |

14:06:40   1          MR. AROVAS:  That's true.  And so -- and so

14:06:43   2     it's a somewhat unique situation, right?  Because

14:06:45   3     certainly both contracts -- right -- obviously, the

14:06:51   4     parties will determine price.  And in many cases --

14:06:53   5          THE COURT:  So it's like $2.50, $3, $3.50,

14:06:59   6     $5?  Is that sort of a gradation?

14:07:03   7          MR. AROVAS:  Yeah, yeah.  I would say

14:07:05   8     probably from the cents to dollars is kind of the

14:07:08   9     gradation, depending on what standard you're talking

14:07:11  10     about, what products, and how they implement it.  But in

14:07:14  11     some ways, Your Honor, I would say it's not that

14:07:16  12     different than, you know, a court having a proceeding

14:07:18  13     that sets damages on a particular claim.  Right?  So the

14:07:22  14     parties would present economic evidence about the value

14:07:24  15     of the patents -- economic evidence about the relative

14:07:30  16     importance of the patents to the products.

14:07:32  17          One thing that's extremely important, is

14:07:34  18     used by a lot of courts, is comparable licenses.

14:07:38  19     Because now that we're on the fifth generation, we have,

14:07:41  20     you know, many, many different market -- you know,

14:07:46  21     freely negotiated license agreements that set sort of a

14:07:49  22     market price.  And because -- because of the FRAND --

14:07:53  23     the ND in FRAND, nondiscrimination, looking at these

14:07:56  24     other licenses and market prices is actually

14:07:59  25     particularly relevant because similarly situated parties

14:08:02   1   are not supposed to be discriminated against.  They're

14:08:04   2   supposed to get similar grades.  And so I would say it's

14:08:10   3   not that dissimilar than what you see in the evidence

14:08:14   4   that people present, it's not that dissimilar in what

14:08:18   5   you see in damages case.

14:08:19   6              THE COURT:  Than what?

14:08:19   7              MR. AROVAS:  It's not dissimilar from what

14:08:21   8   you see in a patent damages case.

14:08:24   9              THE COURT:  Uh-huh.

14:08:25   10              MR. AROVAS:  And so -- but that is the

14:08:27   11   framework.  The only thing that the standard setting

14:08:32   12   bodies say is fair, reasonable, and nondiscriminatory,

14:08:35   13   and they've left that to the regional courts to

14:08:37   14   determine what that is.  And like I said, the evidence

14:08:40   15   that people present are comparable licenses, which

14:08:43   16   basically sets market price and economic metrics that

14:08:47   17   show, sort of, value of the patents and the technology

14:08:50   18   that they bring to particular products.

14:08:52   19              Now, the dispute here is Lenovo is saying

14:08:57   20   that Ericsson is overvaluing their patents and

14:08:59   21   undervaluing Lenovo's patents and that amounts to a

14:09:03   22   breach.  And we're seeking sort of a claim for breach of

14:09:06   23   contract as well as declaratory relief on the terms of

14:09:11   24   the contract.  Ericsson is basically seeking the

14:09:14   25   inverse, saying they fairly value their patents and

| | | |
|---|---|---|
| 14:09:18 | 1 | Lenovo patents in seeking declaratory relief, that |
| 14:09:23 | 2 | they've met their contractual obligations and that |
| 14:09:25 | 3 | Lenovo is the breach. |
| 14:09:26 | 4 | Those contractual claims that have been |
| 14:09:31 | 5 | brought, actually for years in these types of cases, are |
| 14:09:33 | 6 | all pending before the Court right now. |
| 14:09:36 | 7 | So the reason for the motion is really -- as |
| 14:09:40 | 8 | I mentioned up front, is to preserve the status quo to |
| 14:09:45 | 9 | allow this case to move forward without foreign |
| 14:09:48 | 10 | interference to determine -- right? -- sort of these |
| 14:09:53 | 11 | contractual issues.  And what's particularly important |
| 14:09:56 | 12 | here is that injunctive relief -- I should reverse it, |
| 14:10:01 | 13 | say determination of the contractual rights of the |
| 14:10:05 | 14 | parties and whether a breach has occurred here is |
| 14:10:08 | 15 | actually a threshold issue before injunctions can or |
| 14:10:13 | 16 | should be granted. |
| 14:10:15 | 17 | So what we're seeking is this injunction to |
| 14:10:18 | 18 | preserve the status quo between the parties to injoin |
| 14:10:23 | 19 | Ericsson from enforcing injunctions in foreign courts |
| 14:10:29 | 20 | for a period of time, and narrowly tailored to that, to |
| 14:10:32 | 21 | allow the threshold issue of whether there's been a |
| 14:10:35 | 22 | breach here and whether injunctive relief -- |
| 14:10:38 | 23 | THE COURT:  How long are you asking for? |
| 14:10:40 | 24 | MR. AROVAS:  So until a determination of the |
| 14:10:43 | 25 | breach claims. |

14:10:44  1              THE COURT:  And so how is that going to

14:10:46  2   happen?

14:10:47  3              MR. AROVAS:  So that would happen through,

14:10:49  4   you know, the normal process and ultimately in a jury

14:10:52  5   trial.

14:10:52  6              THE COURT:  Ultimately, a jury trial?

14:10:53  7              MR. AROVAS:  A jury trial, yes, Your Honor.

14:10:56  8              THE COURT:  You're seriously going to try a

14:10:57  9   case like this to a jury?

14:11:00  10             MR. AROVAS:  Well, the parties could

14:11:02  11  certainly discuss doing it to the bench.  But it is a --

14:11:07  12  there is a Second Amendment right to a jury trial on

14:11:09  13  this issue.

14:11:10  14             THE COURT:  Sure.

14:11:10  15             MR. AROVAS:  Yes.  And I would say that it

14:11:12  16  has in the past been tried to juries.  I would not

14:11:18  17  disagree with Your Honor, that it's, obviously, a very

14:11:21  18  complicated issue to present, so it would be a challenge

14:11:23  19  to the parties to simplify it for the jury, that we

14:11:27  20  would, obviously, endeavor to do.

14:11:28  21             THE COURT:  Okay.  How long would this jury

14:11:30  22  trial last?

14:11:32  23             MR. AROVAS:  I would say maybe somewhere in

14:11:34  24  the range of seven to ten days.

14:11:39  25             THE COURT:  Okay.

14:11:42  1          MR. AROVAS:  So the important issue here in

14:11:45  2    terms of the ASI is that there are these foreign

14:11:52  3    injunctions pending.  Those foreign injunctions --

14:11:56  4    immense pressure in creating irreparable harm to

14:12:01  5    Lenovo's business.  That is interfering with the ability

14:12:03  6    of this court to move forward and adjudicate these

14:12:06  7    claims.

14:12:07  8          The markets that -- so the injunctions that

14:12:10  9    I mentioned, there are 26 pending cases in Colombia, one

14:12:15  10   pending case in Brazil.  The Brazilian injunction was

14:12:19  11   issued, three of the Colombian injunctions have issued.

14:12:23  12   The markets that are at issue here, Colombia and Brazil,

14:12:26  13   are extremely important to Lenovo.  These are not random

14:12:32  14   jurisdictions that were picked.  They were picked

14:12:34  15   because of their ability to apply pressure to Lenovo, to

14:12:37  16   surrender its claims here.  Twenty-five percent of --

14:12:42  17   approximately 25 percent of Lenovo's worldwide business

14:12:45  18   is in Colombia and Brazil combined.

14:12:49  19          Lenovo is the second largest producer and

14:12:53  20   seller of mobile phones in Brazil, third largest in

14:12:58  21   Colombia.  And Lenovo has two large factories in Brazil

14:13:03  22   that produce millions of phones that would be affected

14:13:06  23   by this injunction.  This is enormously damaging to

14:13:09  24   Lenovo's business.  It sort of affects market share.

14:13:15  25          As Your Honor may know, this is an

| | | |
|---|---|---|
| 14:13:17 | 1 | incredibly competitive market for cell phones.  Lenovo's |
| 14:13:23 | 2 | market share that likely it will never get back.  It |
| 14:13:25 | 3 | will lose customers it will never get back.  It will |
| 14:13:28 | 4 | affect its manufacturing in certain locations.  So this |
| 14:13:31 | 5 | is a huge market with a huge impact on Lenovo. |
| 14:13:36 | 6 | And I think it's important to note that the |
| 14:13:40 | 7 | purpose of these second-filed injunction actions, Your |
| 14:13:45 | 8 | Honor, is precisely because of the pressure it applies |
| 14:13:50 | 9 | because of the importance of these markets to Lenovo. |
| 14:13:54 | 10 | There is no competition between Ericsson and Lenovo. |
| 14:14:00 | 11 | Ericsson doesn't even make phones.  In Colombia and |
| 14:14:04 | 12 | Brazil, Lenovo sells phones, Ericsson doesn't make |
| 14:14:07 | 13 | phones.  There is an obligation to license.  Lenovo is |
| 14:14:11 | 14 | committed under that framework to pay whatever a fair, |
| 14:14:14 | 15 | reasonable, and nondiscriminatory issue -- rate is. |
| 14:14:18 | 16 | So the sole issue between the parties is the |
| 14:14:22 | 17 | amount of money that needs to be exchanged hands -- |
| 14:14:26 | 18 | exchange hands for this license.  And there is no |
| 14:14:28 | 19 | commercial purpose of these injunctions. |
| 14:14:32 | 20 | THE COURT:  How much money has to be |
| 14:14:33 | 21 | exchanged? |
| 14:14:33 | 22 | MR. AROVAS:  Well, there's several offers on |
| 14:14:35 | 23 | the table. |
| 14:14:35 | 24 | THE COURT:  What are they? |
| 14:14:36 | 25 | MR. AROVAS:  So Lenovo has offered 23 cents |

14:14:41  1   as a fair valuation of Ericsson's portfolio.  Ericsson

14:14:46  2   has valued their portfolio at 1 percent of the selling

14:14:50  3   price of the devices, which I think in their brief they

14:14:53  4   calculated was about a buck forty or so.

14:14:56  5             THE COURT:  So the difference between 22

14:14:59  6   cents and a dollar forty?

14:15:01  7             MR. AROVAS:  Yes.  Per unit.

14:15:02  8             THE COURT:  Per unit?

14:15:04  9             MR. AROVAS:  Yes.

14:15:04 10             THE COURT:  And what does that come to in

14:15:06 11   gross terms?

14:15:07 12             MR. AROVAS:  It's a lot of money.  I would

14:15:09 13   have to kind of turn to my colleagues to give me the

14:15:12 14   calculation based on the actual worldwide sales.

14:15:16 15             THE COURT:  Well, I don't think there would

14:15:17 16   be a judgment for 22 cents or 24 cents.  It would be for

14:15:21 17   a gross amount, wouldn't it?

14:15:23 18             MR. AROVAS:  It actually could be done in

14:15:25 19   either way.  I've seen sort of the royalties in cases

14:15:29 20   that have gone to juries set in a per-unit amount.  I've

14:15:33 21   also seen gross amounts.  So I think it could be done

14:15:36 22   either way.

14:15:36 23             THE COURT:  Who pays that?  The user?

14:15:39 24             MR. AROVAS:  No.  It would be paid by the

14:15:41 25   manufacturer.  So the --

14:15:43   1            THE COURT:  So it's a one-time charge?

14:15:44   2            MR. AROVAS:  Well, if it's a per-unit

14:15:46   3    charge, it would go into the future.

14:15:48   4            THE COURT:  It would what?

14:15:49   5            MR. AROVAS:  It would go into the future.

14:15:50   6    So -- because it would be a per-unit amount.  So if you

14:15:53   7    think of -- so we talked about -- I mentioned

14:15:56   8    generations of products -- 5G, 4G.  So right now the

14:16:00   9    parties are talking about what is essentially a 5G

14:16:02  10    license.  So that bucket of patents is essential for 5G.

14:16:07  11    And it doesn't exclude 4G relevance at all because a lot

14:16:11  12    of patents will recycle.  And there's another pending

14:16:14  13    license dispute between parties that's pending right now

14:16:18  14    in the U.K. because there's a earlier license agreement

14:16:21  15    that has a exclusive form selection clause in the U.K.

14:16:26  16            But basically -- right? -- the main dispute

14:16:28  17    is related to 5G patents.  5G rolled out a couple of

14:16:33  18    years ago.  And, really, the technology has been used

14:16:38  19    for many years.  So it would cover past units of 5G

14:16:42  20    sales to date.  So that would be kind of a known number,

14:16:45  21    both in terms of --

14:16:46  22            THE COURT:  What's that number?

14:16:50  23            MR. AROVAS:  May I ask my colleague for the

14:16:52  24    exact number?

14:16:54  25            (Pause.)

14:17:05  1          MR. AROVAS:  Yeah, I'm going to do a quick

14:17:07  2  approximation for Your Honor.  We can get a more precise

14:17:10  3  calculation if Your Honor needs it.  I think it's in

14:17:14  4  order of tens of millions of phones.

14:17:16  5          THE COURT:  Tens of millions?

14:17:17  6          MR. AROVAS:  Yes.

14:17:18  7          THE COURT:  So, like, 80 million?

14:17:20  8          MR. AROVAS:  No.  I would say more like 10

14:17:22  9  or 20 to date.  In that range.

14:17:25  10          THE COURT:  Ten or twenty million?

14:17:27  11          MR. AROVAS:  To date.

14:17:27  12          THE COURT:  Yeah.

14:17:28  13          MR. AROVAS:  But that doesn't cover the

14:17:29  14  future.  Because it is -- 5G, right now, is the current

14:17:32  15  cellular generation.  So new phones are being produced

14:17:36  16  every day using that technology.  So as new sales are

14:17:39  17  made during the life-span of that standard, which would

14:17:43  18  be for many years to come, that would just add to the

14:17:46  19  total.

14:17:47  20          So as I mentioned, 5G is -- it's not in its

14:17:53  21  infancy, but it's a newer -- newer end of its life-span.

14:17:57  22  5G is not available everywhere in the world yet.  It's

14:18:00  23  still being rolled out by cellular companies.  And so

14:18:03  24  these numbers should keep going up and up.

14:18:05  25          THE COURT:  So is there a 6G that's in the

14:18:07   1   works?

14:18:08   2                  MR. AROVAS:  I believe so.  Yes.  Yeah.

14:18:10   3   Like I said --

14:18:10   4                  THE COURT:  Does this go to infinity?

14:18:14   5                  MR. AROVAS:  I don't know.  They do keep

14:18:16   6   getting better each generation.  So we're fortunate in

14:18:20   7   that sense.

14:18:22   8                  But what I will say is since -- you know,

14:18:23   9   the first cellular products came out, maybe in the '70s

14:18:27   10  or even the '60s, and so it goes way back.  I don't

14:18:31   11  think it was called 1G in those early days.  There were

14:18:34   12  a couple of early standards.  But each generation has

14:18:37   13  kind of leapfrogged the other and added functionality.

14:18:40   14  Some recycle technology, some new technology.  In

14:18:44   15  roughly every, like I said, five to six years.

14:18:46   16                 So the expectation would be there will be 6G

14:18:49   17  and then the parties will have to negotiate licenses for

14:18:52   18  that.  There will be 7G and 8G.  I imagine it will

14:18:55   19  certainly continue to go forward.

14:18:56   20                 THE COURT:  Ultimately, they'll just tap

14:18:57   21  your brain.  You won't have to write it down; you can

14:19:00   22  just think it out.

14:19:01   23                 MR. AROVAS:  Well, if you can get it out of

14:19:04   24  the hands of our kids, maybe we'll get rid of all of

14:19:06   25  them.

14:19:06  1           THE COURT:  Yeah.

14:19:07  2           MR. AROVAS:  But anyway, so it will go

14:19:08  3  forward.  So the point is, it's a question of historical

14:19:13  4  liability.  Because, you know, when Your Honor is asking

14:19:15  5  how much money is at stake, there's an issue of

14:19:17  6  historical liability because a certain number of units

14:19:20  7  have been sold to date.  It's also a question of future

14:19:23  8  liability.  These cross-licenses usually go for some

14:19:27  9  period of time to the future.  Because everybody knows

14:19:30 10  that every day more of these devices will be sold.

14:19:35 11           And -- but what's important, I think, in

14:19:37 12  terms of the contract action is it's only about money.

14:19:42 13  Right?  Both sides have promised, have been obligated,

14:19:48 14  irrevocably, to license to the other party.  It's an

14:19:52 15  issue about money, because parties do not compete.  The

14:19:55 16  issues are pending before this Court, and what we are

14:19:57 17  asking the Court to do is stop these coercive foreign

14:20:01 18  injunctions from causing irreparable harm to Lenovo's

14:20:06 19  business, to permit this Court, in whatever procedure we

14:20:09 20  ultimately decide to use, to address the issue.

14:20:13 21           THE COURT:  How do I stop the foreign

14:20:15 22  sovereign?

14:20:17 23           MR. AROVAS:  Well, the injunction would be

14:20:20 24  against the party.  So Your Honor has in front of you

14:20:22 25  right now all the relevant parties that would enforce

14:20:28  1   those injunctions in foreign courts.

14:20:30  2            And in our briefing -- this actually --

14:20:31  3   issue has come up -- this exact issue has come up in two

14:20:35  4   other cases.  In Microsoft versus -- Motorola versus

14:20:42  5   Microsoft case and the Huawei/Samsung cases.  Those are

14:20:46  6   both cited in our brief.  Both of those courts have

14:20:49  7   dealt with this exact issue where they had a pending

14:20:51  8   case for these sort of contractual FRAND issues pending

14:20:57  9   before it.  There were foreign cases that were filed.  I

14:21:02  10  think the Huawei case -- I believe it was simultaneous.

14:21:04  11  And the Motorola case, it was filed -- second filed in

14:21:08  12  foreign jurisdiction.

14:21:09  13           Both of those courts looked at the ASI

14:21:13  14  factors, as well as issue in comity, and it concluded it

14:21:18  15  was appropriate to injoin the party in a narrow way

14:21:22  16  solely for the period of time necessary for the court to

14:21:25  17  reach the contractual set of issues pending before it,

14:21:28  18  to allow those cases to go forward without interference.

14:21:33  19           THE COURT:  Did you -- did your company not

14:21:35  20  appear in Colombia and Brazil?

14:21:39  21           MR. AROVAS:  In Colombia, it was ex parte.

14:21:41  22  Now, we do have an opportunity to appeal.  That appeal

14:21:45  23  will take, I think, roughly six to eight months to be

14:21:49  24  resolved.  And so it may be the case after that appeal

14:21:54  25  in that the injunction may dissolved.  But we still have

14:21:57  1    the problem for that six to eight months, we have a

14:22:00  2    first-filed action here and we have irreparable harm

14:22:05  3    suffered by the business in that period of time for

14:22:08  4    these preliminary injunctions when the very contractual

14:22:12  5    issues pending before Your Honor are sort of the

14:22:16  6    condition precedent of the threshold issue.

14:22:18  7            It's like putting the cart before the horse,

14:22:20  8    right?  The first question that has to be answered is,

14:22:24  9    is there a breach here and is it appropriate for the

14:22:28  10   party to even get injunctive relief.  That needs to be

14:22:32  11   resolved, and that's why we're asking for this

14:22:35  12   preliminary relief, the ASI, to just free up this Court

14:22:38  13   to reach those decisions.

14:22:39  14           And then -- then the Court can -- after that

14:22:43  15   is resolved by this Court -- right? -- then it will be

14:22:47  16   clear what is permitted and what not permitted by the

14:22:49  17   party in those other jurisdictions.  And one of the

14:22:53  18   reasons why it's perfectly appropriate -- we see it in

14:22:56  19   Motorola and the Microsoft and the Huawei cases.  Is

14:23:01  20   perfectly appropriate for a U.S. court to do this

14:23:05  21   because the contract before Your Honor is a global

14:23:09  22   contract.  It's not a contract for a particular

14:23:12  23   jurisdiction.  The obligation before Your Honor is the

14:23:16  24   obligation to grant a global license, including all the

14:23:21  25   countries in the world because it's the same standard.

14:23:23  1   It's the same standard that's used in the same way in

14:23:30  2   all the products that are sold across the world.  And so

14:23:33  3   it's not a country-by-country analysis.  In the global

14:23:37  4   issue of what the rate should be and whether there has

14:23:41  5   been a breach is pending in this first-filed action, not

14:23:45  6   in Colombia and not in Brazil.

14:23:54  7           Now, Your Honor, I would like to actually

14:23:57  8   also respond to a couple of points that were made in the

14:24:00  9   Ericsson motion, which is right up front.  First, I

14:24:05  10  think there was a inaccurate statement of the relief

14:24:11  11  that is being sought.

14:24:12  12          So in Ericsson's motion, they talk about

14:24:15  13  shutting down foreign jurisdictions and shutting down

14:24:18  14  foreign litigation.  That is not in any way, shape, or

14:24:21  15  form what we are asking of this Court.  The injunction

14:24:25  16  that we're asking for is narrowly tailored solely to

14:24:32  17  stop the enforcement of preliminary injunctions in these

14:24:36  18  foreign countries long enough for this Court to reach

14:24:40  19  the issues that were first filed here.  That's it.  All

14:24:44  20  of these foreign cases can go forward.  They can

14:24:47  21  determine infringement, all the technical issues.  They

14:24:51  22  can determine validity.  They can address whatever other

14:24:55  23  issue they want to address.  The only thing we're

14:24:57  24  seeking is to put a hold on these coercive foreign

14:25:03  25  preliminary injunctions to give Lenovo the room to go

14:25:06  1   forward in this case and litigate its breach of contract

14:25:09  2   claim.

14:25:11  3          Second, it was kind of an allegation in the

14:25:15  4   briefs that Lenovo has refused to pay a FRAND rate for a

14:25:22  5   decade.  That is entirely false.  We have not -- Lenovo

14:25:27  6   has not refused to pay for ten years.  They have not

14:25:30  7   refused to pay for ten days.  The exact opposite is

14:25:34  8   true.  Lenovo has actually gone to Ericsson and said we

14:25:39  9   need to resolve this global dispute between the parties.

14:25:42  10  Right?  We need to reach a license agreement.  We both

14:25:46  11  made irrevocable commitments to license all-comers.  We

14:25:50  12  will do it in your form of choosing.  They said if you

14:25:54  13  want to do it in this court, we're fine to litigate

14:25:58  14  issues in this court.

14:25:59  15         There's also a pending case in the U.K.  The

14:26:01  16  U.K. court has a long history and actually has some

14:26:06  17  causes of action that we don't have here to set rates

14:26:10  18  worldwide.  There's a pending action there as well as

14:26:14  19  the license dispute with exclusive jurisdiction.  We

14:26:18  20  said you can resolve it in the U.K.  We have offered

14:26:21  21  arbitration.  In fact, there's a pending arbitration

14:26:24  22  offer right now.  We had asked for a response before

14:26:26  23  this hearing.  But Ericsson has declined to give us a

14:26:33  24  final response on that, but there's an arbitration offer

14:26:36  25  pending.

14:26:36  1      So this can be done in this court.  It can

14:26:39  2  be done in the U.K.  It could be done in an arbitration.

14:26:43  3  All of those are fine with Lenovo.  The only thing

14:26:47  4  that's important to Lenovo is that we get to the core

14:26:48  5  issue between the parties, which is one of late without

14:26:52  6  the coercive pressure of these foreign injunctions.

14:26:56  7  Lenovo has also, Your Honor, exhausted all opportunities

14:27:01  8  to avoid moving for this ASI.

14:27:04  9      So the U.K. court has a procedure that

14:27:08  10  allows for the setting of an interim license.  We asked

14:27:12  11  for Ericsson's consent to go forward and have the U.K.

14:27:16  12  set an interim license.  Lenovo was willing and offered

14:27:20  13  to put up a very substantial security payment in that

14:27:23  14  action.  The specific number's confidential, but it's in

14:27:26  15  the briefing, Your Honor.  And said, okay, we can set --

14:27:31  16  if you're worried about the protection of your

14:27:34  17  intellectual property, we will agree to have the court

14:27:38  18  set interim license that will then go into effect until

14:27:40  19  a final adjudication can be made.  That was rejected.

14:27:44  20  Lenovo has said, okay, you're complaining about the deal

14:27:50  21  in Colombia.  We obviously disagree the patents are

14:27:52  22  being used in Colombia and Brazil, but that has not been

14:27:57  23  finally adjudicated.

14:27:58  24      Put that aside, Lenovo said, you know what?

14:28:00  25  We will pay you your asking price in Brazil and Colombia

14:28:05  1   if you drop the injunctions subject to, obviously, a

14:28:08  2   credit when the courts come up with what the final

14:28:11  3   amount is.  So if there's an overpayment, that will be

14:28:14  4   creditable.  That was rejected.

14:28:17  5        Lenovo also offered to do the same thing on

14:28:21  6   a worldwide basis.  Said, okay, we'll do it on a

14:28:24  7   worldwide basis.  Pay interim payment.  You drop the

14:28:28  8   injunctions.  We get to this business of getting to the

14:28:31  9   dispute between the parties, which is great.  We get

14:28:34  10  that adjudicated.  If we overpay, we get a credit.  If

14:28:38  11  we underpaid, we have to then true up.  That was

14:28:41  12  rejected.

14:28:42  13        So Lenovo has offered to litigate.  And Your

14:28:45  14  Honor commented this may be difficult to do in front of

14:28:47  15  a jury.  But Lenovo said we can do it in arbitration.

14:28:50  16  We can do it in the U.K. court.  We can do it in this

14:28:53  17  court.  Lenovo said if you're worried about what happens

14:28:56  18  between now and then, we're willing to do an interim

14:29:00  19  license in the U.K., have that litigated.  We're willing

14:29:04  20  to do interim payments in Colombia and Brazil.  We're

14:29:07  21  willing to do interim payments worldwide.  Everything

14:29:10  22  has been rejected.  And it's been rejected for a very

14:29:14  23  commonsense reason.

14:29:16  24        They know and we know 25 percent of our

14:29:19  25  business is in Brazil and Colombia.  It is incredibly

14:29:23  1  harmful for the business to be under those injunctions.

14:29:29  2  They know that applies immense business pressure to try

14:29:32  3  to force us to accept what would be an unfair and

14:29:37  4  contractually prohibited amount just because of the

14:29:40  5  coercive affect of those injunctions.  And that's, Your

14:29:44  6  Honor, at bottom, of why we're here.

14:29:46  7          And the other thing I would mention is

14:29:48  8  Lenovo has offered as negotiated in good faith

14:29:53  9  throughout this entire process.  The 23 cents -- Your

14:29:57 10  Honor asked what the sort of bid and ask were.  The 23

14:30:01 11  cents that was -- that was offered by Lenovo, that's not

14:30:05 12  picked out of thin air.  There are current adjudications

14:30:09 13  by the U.K. court of 5G technology, which -- so the

14:30:15 14  total royalty burden for a hundred percent of the

14:30:17 15  patents, we took that, applied the Ericsson percentage,

14:30:20 16  and said, okay, we'll pay you basically your fair share

14:30:25 17  of an already adjudicated amount for 5G.  That's where

14:30:29 18  the 23 cents comes from.

14:30:31 19          There was this sort of suggestion -- not a

14:30:34 20  suggestion.  It was argument in the brief by Ericsson

14:30:39 21  that Lenovo has been operating unlicensed for all these

14:30:44 22  years.  What they don't mention is the Lenovo phone

14:30:48 23  business was purchased from Motorola.  So Motorola

14:30:54 24  Mobility purchased the company.  That entity operates as

14:30:57 25  the Lenovo phone business, making the cellular phones

14:31:02  1   that use this 5G technology.  They have a comprehensive,

14:31:08  2   worldwide lifetime of the patents license for every

14:31:13  3   patent with a priority date up to 2016.  Which, by the

14:31:19  4   way, includes pretty much all of the 4G technology.  It

14:31:21  5   includes all of the prior technology.  It includes just

14:31:24  6   about all of Lenovo's phones going back more than a

14:31:27  7   couple of years from now.  All licensing.

14:31:31  8          There is a dispute between the parties in

14:31:33  9   this U.K. contract action that's pending about exactly

14:31:37  10  how does it apply to 5G.  We believe it covers a large

14:31:41  11  percentage of the 5G patents because you can just simply

14:31:46  12  recycle 4G patents that were already licensed.  That's

14:31:49  13  disputed.  That's been litigated.  The point is Lenovo

14:31:52  14  has a license to Ericsson patents that goes back many

14:31:56  15  years.

14:31:57  16         THE COURT:  What do patents have?

14:31:59  17  Nineteen-year lives?

14:32:00  18         MR. AROVAS:  Twenty years.

14:32:01  19         THE COURT:  Twenty?

14:32:02  20         MR. AROVAS:  Twenty, yeah.

14:32:02  21         THE COURT:  Okay.

14:32:03  22         MR. AROVAS:  Twenty years.

14:32:04  23         THE COURT:  And are there patents that have

14:32:06  24  expired in technology that's in use now that it's in the

14:32:11  25  public domain?

14:32:12  1          MR. AROVAS:  Yes.  So I would say there's

14:32:14  2  probably three buckets.

14:32:15  3          THE COURT:  What's that?

14:32:16  4          MR. AROVAS:  Three buckets of patents, to

14:32:18  5  answer your question.  There are older patents that have

14:32:22  6  run their lifespan that are expired.  Those go into the

14:32:26  7  public domain, anybody can use it, you don't have a date

14:32:28  8  of that.  Nobody is to pay for those.  They're in the

14:32:30  9  public domain.

14:32:32  10          You have patents that are still in force but

14:32:35  11  have a priority date before this -- the 2016 cutoff of

14:32:40  12  that license agreement.  Those have been licensed for

14:32:44  13  their life to Lenovo.  And there's a cross-license from

14:32:49  14  Lenovo back to Ericsson as well.  It's a two-way

14:32:52  15  license.  So those patents are licensed clearly for 4G.

14:32:58  16  There's a dispute between the parties right now pending

14:33:00  17  in the U.K.  It's under that license agreement exclusive

14:33:05  18  form selection clause of the U.K.  So about whether

14:33:08  19  those patents, if they are recycled for 5G, whether

14:33:13  20  they're licensed for 5G.  Lenovo believes they are.  And

14:33:16  21  if they are, that would be a -- a substantial portion of

14:33:21  22  the Ericsson patents for 5G would already be licensed.

14:33:24  23  Ericsson is disputing that.  That's something that will

14:33:27  24  get resolved in that contract case.

14:33:32  25          So turning to the relevant factors, Your

14:33:39  1   Honor.  We went through these in our brief, so I'll be

14:33:42  2   fairly brief about it.  There's basically three buckets

14:33:47  3   of issues to deal with related to the ASI.  One is the

14:33:50  4   threshold issues.  Same parties, substantially the same

14:33:54  5   issues.  The ASI factors themselves, the preliminary

14:33:58  6   injunction factors.

14:34:00  7          With regard to parties, you've got all the

14:34:04  8   right parties here.  The Ericsson party is the same in

14:34:07  9   Colombia and Brazil as it is in this court.  So the same

14:34:12  10  Ericsson entity.  You have the right Lenovo party as

14:34:15  11  well.  Because the party that's in this case is the

14:34:19  12  party that was responsible for negotiating the worldwide

14:34:24  13  license and is also the party that is the defendant in

14:34:27  14  Ericsson's breach of contract case.  So you've got the

14:34:30  15  right parties.

14:34:31  16         The issue is the same issue.  Both the

14:34:34  17  Motorola -- Microsoft/Motorola case and the Huawei case

14:34:38  18  dealt with that.  That the contract here is a global

14:34:42  19  contract, deals with all of the patents in the world.

14:34:44  20  The threshold issue is the availability of relief if

14:34:48  21  there's breach.  So it's really the same issue pending

14:34:51  22  here that affects the foreign injunctions.  Those are

14:34:54  23  the threshold issues.

14:34:56  24         With regard to the ASI factors, there's four

14:34:59  25  factors for Your Honor to consider.  This is a "or"

| | | |
|---|---|---|
| 14:35:02 | 1 | test, not an "and" test.  It's disjunctive.  So if any |
| 14:35:07 | 2 | of the four factors are present in Your Honor's |
| 14:35:10 | 3 | discretion, you can issue an ASI.  The issues are |
| 14:35:13 | 4 | whether there's a frustration of a policy in this court, |
| 14:35:16 | 5 | wether the formed litigation is vexatious, whether it |
| 14:35:21 | 6 | threatens this Court's jurisdiction, and whether it |
| 14:35:24 | 7 | prejudices various equitable considerations.  These |
| 14:35:30 | 8 | issues are all dealt with.  We deal extensively in the |
| 14:35:34 | 9 | briefing with the -- sort of the Microsoft and the |
| 14:35:37 | 10 | Huawei case, which are the two seminal cases that deal |
| 14:35:41 | 11 | with this issue in exactly the same situation.  And they |
| 14:35:45 | 12 | have found that multiple of these factors apply in |
| 14:35:50 | 13 | exactly the same types of circumstances we have here. |
| 14:35:53 | 14 | So, for example, with regard to the policies |
| 14:35:56 | 15 | of this Court as well as the Court's -- protection of |
| 14:35:59 | 16 | this Court's jurisdiction, it's basically -- I think the |
| 14:36:06 | 17 | Huawei case said it very succinctly:  That the policy |
| 14:36:09 | 18 | that's underlining this Court's ability to determine the |
| 14:36:14 | 19 | propriety of an injunction in the first instance.  So |
| 14:36:18 | 20 | it's kind of a cart-before-the-horse kind of issue. |
| 14:36:21 | 21 | That the Court in that -- in the Huawei case concluded |
| 14:36:25 | 22 | the first thing you have to determine is the contract |
| 14:36:28 | 23 | issues.  Is there a breach?  Did the parties meet their |
| 14:36:32 | 24 | obligation?  And then coming out of it, it will tell you |
| 14:36:36 | 25 | whether injunctive relief is appropriate or not |

14:36:39   1   appropriate.

14:36:40   2           So that also goes -- Court also recognized

14:36:46   3   that both frustrated court policy and protected

14:36:51   4   jurisdiction comes up in the context of inconsistent

14:36:54   5   verdicts.  That you have a risk of inconsistent verdicts

14:36:58   6   if this Court hears the contract issues and concludes,

14:37:03   7   through jury trial or other means, that there was a

14:37:06   8   breach, injunctive relief is not appropriate.  That,

14:37:09   9   obviously, is the exact opposite of what's going on in

14:37:12   10  these foreign courts.

14:37:13   11          And there's also the risk of what both the

14:37:16   12  Huawei and the Microsoft case talked about:  Hold up

14:37:22   13  severance.  Right?  The fact that if you apply enough

14:37:25   14  pressure to the party in these coercive foreign

14:37:28   15  injunctions, it could force a settlement before the

14:37:31   16  parties even have the opportunity to reach the

14:37:36   17  fundamental contractual issues that define what fair

14:37:39   18  price is.  The Court -- the foreign case is also

14:37:44   19  vexatious for the reason that I think was recognized by

14:37:50   20  the Microsoft case, affirmed by the Ninth Circuit.

14:37:54   21  Where what they said is that the maneuver to harass

14:37:57   22  Microsoft with an injunction by removing products from

14:38:01   23  an important market interferes with the Court's ability

14:38:04   24  to decide the questions -- contractual questions before

14:38:07   25  it.

| | | |
|---|---|---|
| 14:38:07 | 1 | That's exactly what we have here. |
| 14:38:10 | 2 | First-filed case here, later-filed cases, injunction |
| 14:38:14 | 3 | request in these foreign jurisdictions targeting |
| 14:38:17 | 4 | critical markets where there is no competition, the |
| 14:38:20 | 5 | issue is solely the amount of money to be paid, which is |
| 14:38:25 | 6 | applying pressure for causing irreparable harm to Lenovo |
| 14:38:30 | 7 | businesses.  Pressure to surrender the ability to pursue |
| 14:38:32 | 8 | what is a fair contractual rate in this case. |
| 14:38:38 | 9 | The issues of comity are addressed by |
| 14:38:41 | 10 | Microsoft and the Huawei case as well.  Private cause of |
| 14:38:45 | 11 | action which causes less concern of international |
| 14:38:48 | 12 | comity.  First-filed case is significant.  The |
| 14:38:52 | 13 | actions -- the contractual actions were brought up in |
| 14:38:55 | 14 | this court first.  So this court is the first-filed |
| 14:38:59 | 15 | action.  As well as the fact that the ASI is narrowly |
| 14:39:04 | 16 | tailored.  It's narrowly tailored solely to eliminate |
| 14:39:08 | 17 | the enforcement of the preliminary injunction to give |
| 14:39:12 | 18 | this court the freedom to address the issues.  For those |
| 14:39:15 | 19 | reasons, Your Honor, we would request that Your Honor |
| 14:39:18 | 20 | grant the requested ASI. |
| 14:39:21 | 21 | THE COURT:  Okay. |
| 14:39:22 | 22 | MR. AROVAS:  Thank you, Your Honor. |
| 14:39:22 | 23 | THE COURT:  Thank you. |
| 14:39:27 | 24 | Who is going to speak for the plaintiff? |
| 14:39:29 | 25 | MR. STEVENSON:  Good afternoon, Your Honor. |

14:39:31  1    Ted Stevenson with Alston & Bird.

14:39:33  2              THE COURT:  Okay.

14:39:34  3              MR. STEVENSON:  And with me are Thomas

14:39:35  4    Walker and Nick Matthews.  And I'll be doing the

14:39:39  5    presentation.

14:39:39  6              THE COURT:  Okay.

14:39:41  7              MR. STEVENSON:  I know Your Honor probably

14:39:43  8    has a number of questions, but I think I would like to

14:39:46  9    start, if it's all right, with the equities, which are

14:39:49 10    always important.

14:39:50 11              THE COURT:  With the what?

14:39:51 12              MR. STEVENSON:  With the equities.

14:39:52 13              THE COURT:  Equities, yeah.

14:39:56 14              MR. STEVENSON:  The patents in this case

14:39:58 15    cover the cellular radio in a cell phone.  That's what

14:40:02 16    the patents are.  And we've all lived through the

14:40:07 17    revolution of the cell phone.  From my standpoint,

14:40:11 18    probably without question, the most significant

14:40:15 19    invention in my lifetime is the cell phone.  We've been

14:40:18 20    through 2G, 3G, 4G, and 5G phones.  The 2G phones could

14:40:23 21    only make calls, and they dropped them a lot.  And then

14:40:26 22    3G, maybe you could text photos.  And 4G, you could

14:40:30 23    screen video.  And now we're up to 5G, and now things

14:40:34 24    beyond phones are happening with 5G.  We have the

14:40:37 25    Internet of Things, where connected devices -- cars,

14:40:40  1    things like that -- are all participating.

14:40:42  2            And Mr. Arovas was correct, every five, six,

14:40:45  3    seven years there's a generational step.  The G -- the

14:40:49  4    2G, 3G, or 4G -- refers to the radio inside the cell

14:40:55  5    phone.  And it's a radio that connects to the base

14:40:59  6    station.  You get on top of the water tower out there or

14:41:02  7    you're miles away to somewhere, a base station, a cell

14:41:05  8    tower along the highway.  But it's a radio that is so

14:41:08  9    sophisticated, so advanced, that something this small

14:41:12  10   can stream enough information to actually watch TV, and

14:41:16  11   so can 40- or 50,000 other people who are connected to

14:41:19  12   that same base station.  And it is that radio that

14:41:24  13   Ericsson's inventions pertain to and that Ericsson has

14:41:28  14   invested the last 25 years advancing the cause of.

14:41:34  15           The creator of the radio standard is a

14:41:40  16   standard development group today called the Third

14:41:42  17   Generation Partnership Project.  And it is a group that

14:41:48  18   is comprised of all the industry leaders, that they send

14:41:53  19   their best and brightest Ph.D. engineers to meetings to

14:41:58  20   create the next standard.  And it takes immense amounts

14:42:02  21   of work.  Ericsson spends probably $4 billion a year in

14:42:06  22   research and development.  They send teams of engineers

14:42:09  23   to these industry meetings.

14:42:11  24           And what happens is at these meetings, the

14:42:15  25   engineers for all the companies -- and it's a bit of a

14:42:18  1  competition -- contribute their inventive ideas to make

14:42:22  2  the radio in the cell phone better.  And frequently

14:42:25  3  those ideas are covered by patents.  And here's where

14:42:28  4  FRAND comes in.

14:42:31  5          In order to not allow the standard to be

14:42:35  6  blocked by patent owners -- right?  Because as the Court

14:42:38  7  knows, a patent is a right to exclude.  And the default

14:42:43  8  rule for patents is you don't have to license them.

14:42:45  9  It's your property and you can do with it what you want

14:42:47  10  to.  But because there's a common standard that has been

14:42:52  11  promulgated, the companies involved voluntarily agree

14:42:55  12  that they will license their patents on fair,

14:42:58  13  reasonable, and nondiscriminatory terms so as not to

14:43:02  14  allow it to be bought.  And that's the FRAND commitment

14:43:06  15  we're talking about here.  And it's literally a

14:43:08  16  one-sentence contract.  It is a form where a box is

14:43:11  17  checked and it literally says we will license on fair,

14:43:15  18  reasonable, nondiscriminatory terms.

14:43:17  19          But this contract, Your Honor, is a two-way

14:43:20  20  street.  Because although it keeps the standard from

14:43:26  21  being blocked, it also at the same time permits the

14:43:32  22  patent owners who contribute their technology to the

14:43:35  23  rest of the industry in these meetings, so it gets in

14:43:38  24  the standard, it allows them to reap a fair reward for

14:43:43  25  what they've contributed.  A fair royalty.

14:43:47  1          Now, Ericsson is one of the largest

14:43:49  2   contributors to and one of the largest patent holders

14:43:52  3   for 5G, as it was for 4G, as it was for 3G.  It's been

14:43:58  4   involved in this process as one of the key figures since

14:44:02  5   the early days of 2G.  Ericsson has close to 500 patent

14:44:05  6   families pertaining to 5G.  And a patent family isn't

14:44:11  7   just one patent.  It's a group of related patents all

14:44:13  8   over the world.  Maybe 10, 20 patents.  So literally

14:44:17  9   Ericsson has thousands, if not tens of thousands, of

14:44:20  10  patents that are essential to the standards and that it

14:44:23  11  has contributed for this process.  And the FRAND

14:44:29  12  commitment allows Ericsson to recover fair royalties,

14:44:32  13  but it creates a difficulty.

14:44:35  14          The difficulty that is created is the

14:44:37  15  following:  After companies like Ericsson contribute

14:44:44  16  their patents to the standard and they're selected for

14:44:46  17  inclusion because it's the best technology, anybody can

14:44:49  18  use the standard.  Any company in the world can download

14:44:54  19  the standard and start building products, and they don't

14:44:57  20  have to get our permission in advance.  And then

14:45:00  21  Ericsson has to come along and knock on the door and has

14:45:03  22  to request to be paid a fair royalty.  And that's the

14:45:08  23  difficulty, because once a company is already using the

14:45:12  24  technology when we come and knock on the door, they view

14:45:15  25  us as the tax collector.  And nobody is excited to see

14:45:18  1    us.  They're happy to use our technology but they don't

14:45:21  2    want to see us.  And what that leads to and the

14:45:24  3    difficulty it leads to is something called "hold out."

14:45:27  4    And hold out is simply reluctance to pick up the pen and

14:45:32  5    sign the license agreement and pay fair royalties.

14:45:35  6          Lenovo has been holding out for over ten

14:45:38  7    years.  And they haven't signed a license agreement on

14:45:42  8    behalf of Lenovo to pay us licenses or royalty rates for

14:45:46  9    the 5G phones that they're now today selling.  And we've

14:45:50  10   asserted patents.

14:45:54  11         So getting to the equities now.  What is our

14:45:58  12   offer on the table and why is it fair and are we going

14:46:02  13   to prevail on the merits of showing our offer is fair.

14:46:04  14   And the answer is yes.  We've offered Lenovo a royalty

14:46:08  15   rate of 1 percent of the price of a phone with a $4 cap.

14:46:13  16   That's a one-time payment good for the life of a phone.

14:46:17  17   That covers all of Ericsson's 4G and 5G patents.

14:46:21  18   Thousands, if not tens of thousands, of patents

14:46:23  19   worldwide.  And that payment, on average, because

14:46:31  20   Lenovo's average selling price is about 140 to 150

14:46:35  21   dollars, would have Lenovo paying about $1.40 to $1.50

14:46:39  22   per phone.  One-time payment good for the life of the

14:46:42  23   phone.

14:46:44  24         And that rate, we think, is overwhelmingly

14:46:50  25   FRAND for three reasons.  One is that rate that we have

14:46:54  1  offered to Lenovo has been adjudicated to be FRAND as to

14:46:58  2  Ericsson's portfolio by a United States District Court

14:47:02  3  and by the Fifth Circuit Court of Appeals.  Second

14:47:05  4  reason is the industry has accepted this rate as being

14:47:11  5  FRAND and as with foreknowledge of what the price was

14:47:16  6  going to be has put Ericsson's technology into the

14:47:20  7  standard.  And third, the market for licenses, the

14:47:24  8  licensing market has accepted this rate and there have

14:47:27  9  been a number of licenses that companies who compete

14:47:32  10  with Lenovo have signed with Ericsson at this same rate.

14:47:35  11          And in contrast to that, Lenovo is offering

14:47:40  12  23 cents.  That's their offer on the table, and that's

14:47:44  13  it.  And that is far too low to be FRAND.  And it's not

14:47:48  14  fair to the other companies who are paying the FRAND

14:47:51  15  rate consistently that Ericsson requests.

14:47:55  16          Let me go first to the adjudication.  And in

14:47:59  17  a case between Ericsson and HTC -- and if I may, Your

14:48:04  18  Honor, may I approach, please, and hand Your Honor some

14:48:07  19  slides?

14:48:07  20          THE COURT:  Okay.

14:48:08  21          MR. STEVENSON:  I have about 10 or 11.

14:48:10  22  Thank you.

14:48:11  23          (Document handed to the Court.)

14:48:22  24          THE COURT:  So if 80 cents was a good middle

14:48:26  25  ground, you could shake hands and settle the case today?

14:48:29  1          MR. STEVENSON:  Your Honor, no, because

14:48:31  2   we've already made very substantial discounts to Lenovo.

14:48:36  3   And --

14:48:36  4          THE COURT:  Who is going to decide what's

14:48:38  5   fair?  A jury?

14:48:39  6          MR. STEVENSON:  A jury would decide.

14:48:40  7          THE COURT:  And so they can give you 50

14:48:42  8   cents or a dollar fifty or a dollar?

14:48:47  9          MR. STEVENSON:  It's not actually a damages

14:48:48  10  case, Your Honor; it's a breach of contract case.  So

14:48:51  11  what the jury would decide would be whether Ericsson has

14:48:55  12  complied with its FRAND contract, yes or no.

14:48:58  13          So they would look at our offer that we made

14:49:00  14  to Lenovo.  They would compare it to the comparable

14:49:03  15  licenses, the adjudications --

14:49:05  16          THE COURT:  Don't you have the power to shut

14:49:07  17  Lenovo down and not let them use your technology?

14:49:12  18          MR. STEVENSON:  Well, only through legal

14:49:14  19  recourse.  In other words, we can't turn off their

14:49:16  20  phones.  It's impossible.  When we take our technology

14:49:20  21  and we put it in the standard --

14:49:22  22          THE COURT:  Right.

14:49:22  23          MR. STEVENSON:  It's out there in the

14:49:23  24  public.

14:49:24  25          THE COURT:  Yeah.

14:49:24  1          MR. STEVENSON:  Everybody can start building

14:49:25  2    it and using it, and we can't take it back.  And that's

14:49:28  3    why we're vulnerable.  Because once we provide the

14:49:31  4    technology to the 3GPP, the standard development

14:49:36  5    organization, and it gets included in the standard,

14:49:40  6    we -- we can't take it back.  We can't take that out of

14:49:43  7    there.  People can just start using it --

14:49:45  8          THE COURT:  Well, did you not consider that

14:49:47  9    there would be thieves, that people would take advantage

14:49:50  10   of you and how would you protect yourself?

14:49:53  11         MR. STEVENSON:  By filing patent

14:49:55  12   infringement suits.

14:49:56  13         THE COURT:  That's a difficult --

14:49:58  14         MR. STEVENSON:  That's our only recourse.

14:49:59  15         THE COURT:  That's a difficult way to do it.

14:50:00  16         MR. STEVENSON:  It is.  But it's the way the

14:50:02  17   standard is developed.  It's the way we kind of don't

14:50:04  18   have much choice but to do business that way.  And the

14:50:08  19   vast majority of companies in the industry are able to

14:50:13  20   be licensed and they have been licensed by Ericsson.

14:50:16  21   Almost every company in the industry, all of Lenovo's

14:50:19  22   competitors have licenses with us at the rates that

14:50:22  23   we've discussed with Your Honor.

14:50:24  24         But there are some companies that hold out.

14:50:27  25   They're trying to just save money and get a better deal.

| | | |
|---|---|---|
| 14:50:30 | 1 | THE COURT:  Well, since they haven't signed |
| 14:50:31 | 2 | a contract or paid you in ten years, why don't you stop |
| 14:50:34 | 3 | giving them the technology? |
| 14:50:35 | 4 | MR. STEVENSON:  Well, because we don't give |
| 14:50:37 | 5 | them the technology directly.  What we do is we provide |
| 14:50:40 | 6 | it to the group that essentially establishes the |
| 14:50:47 | 7 | technology, the blueprint for building, for instance, a |
| 14:50:50 | 8 | 5G phone.  And then that group puts that information out |
| 14:50:54 | 9 | publicly.  And so anybody can build a 5G phone according |
| 14:50:57 | 10 | to the blueprint.  It's basically an open blueprint. |
| 14:51:01 | 11 | And we have to come along afterwards and we have to |
| 14:51:03 | 12 | collect our royalties.  And yes, we are vulnerable, |
| 14:51:07 | 13 | because when companies find out -- once they already |
| 14:51:11 | 14 | have the technology, they're trying to delay payment as |
| 14:51:14 | 15 | long as they can.  And that's been a little bit of our |
| 14:51:16 | 16 | problem here. |
| 14:51:17 | 17 | THE COURT:  So is this a chronic thing, |
| 14:51:19 | 18 | suing people? |
| 14:51:21 | 19 | MR. STEVENSON:  Ericsson doesn't like to sue |
| 14:51:23 | 20 | people.  It has had litigations.  But the majority of |
| 14:51:26 | 21 | its licenses are accomplished by negotiations and |
| 14:51:29 | 22 | without litigation.  A vast majority. |
| 14:51:33 | 23 | And one of the reasons, Your Honor, is, you |
| 14:51:36 | 24 | know, companies like Lenovo, the implementers of the |
| 14:51:40 | 25 | technology, they want to keep Ericsson involved in the |

14:51:45  1    standard-setting organization.  They want our technology

14:51:47  2    coming in.  Ericsson has a large group of engineers.

14:51:50  3    Some of the smartest -- I mean, tens of thousands of

14:51:54  4    some of the smartest cellular engineers in the world.

14:51:57  5    And many of the inventions, some of the ones in this

14:52:00  6    case and in the large portfolio of patents, the hundreds

14:52:03  7    of patent families, are what make your phone so much

14:52:07  8    better than it was five, six years ago.  And the

14:52:10  9    companies want that in there.  So they realize they have

14:52:13  10   to pay a fair reward to Ericsson.

14:52:16  11            There are some exceptions.  And Lenovo,

14:52:18  12   candidly, is an exception where they're just trying to

14:52:21  13   pressure us into capitulating to sign a bad deal with

14:52:24  14   them.  And it's not fair to us.  But it's also not fair

14:52:27  15   to the companies that compete with them that pay us the

14:52:29  16   rate that has been adjudicated to be FRAND.

14:52:33  17            THE COURT:  Okay.

14:52:36  18            MR. STEVENSON:  Your Honor, on slide 4 -- I

14:52:46  19   put a slide up here with some language from a very

14:52:49  20   important case.  There is another company that Ericsson

14:52:54  21   dealt with several years ago.  It's called HTC.  And

14:52:59  22   it's on the fourth slide, the one that says Ericsson's

14:53:02  23   rate has been adjudicated as FRAND.  And that case went

14:53:07  24   to trial in the Eastern District of Texas, federal

14:53:11  25   court.  The question was presented to the jury:  For

| | | |
|---|---|---|
| 14:53:14 | 1 | Ericsson's 4G portfolio of patents, was Ericsson's |
| 14:53:21 | 2 | offer, the HTC, FRAND?  Our offer was the same exact |
| 14:53:26 | 3 | offer as it is to Lenovo:  1 percent with a $4 cap.  And |
| 14:53:32 | 4 | we gave them an option, or $2.50. |
| 14:53:36 | 5 | What the U.S. District Court found in its |
| 14:53:39 | 6 | findings of fact and conclusions of law -- and it |
| 14:53:41 | 7 | entered judgment -- was that both offers, $2.50 a phone |
| 14:53:49 | 8 | or 1 percent with a $4 cap, both of those offers |
| 14:53:55 | 9 | complied with FRAND.  And HTC is a competitor -- at the |
| 14:54:01 | 10 | time was a competitor of Lenovo.  They make Android |
| 14:54:05 | 11 | phones.  We thought that would be a fairly persuasive |
| 14:54:09 | 12 | factfinding.  It went up to the Fifth Circuit.  The |
| 14:54:12 | 13 | Fifth Circuit affirmed in all regards.  And that's what |
| 14:54:18 | 14 | I meant when I told Your Honor that this rate has been |
| 14:54:22 | 15 | adjudicated as FRAND.  And 5G -- |
| 14:54:25 | 16 | THE COURT:  It went to the Fifth Circuit |
| 14:54:27 | 17 | because it was a contract case, not a patent case? |
| 14:54:29 | 18 | MR. STEVENSON:  Correct.  Yes.  It was a |
| 14:54:30 | 19 | contract case. |
| 14:54:31 | 20 | THE COURT:  Okay.  And what's this?  A |
| 14:54:34 | 21 | contract case? |
| 14:54:34 | 22 | MR. STEVENSON:  This is -- these claims are |
| 14:54:36 | 23 | contract claims.  But because they're also patents |
| 14:54:39 | 24 | pending, it will go to the Federal Circuit. |
| 14:54:42 | 25 | THE COURT:  A review in this case will go to |

| | | |
|---|---|---|
| 14:54:43 | 1 | the Federal Circuit? |
| 14:54:45 | 2 | MR. STEVENSON:  Correct.  Yes. |
| 14:54:47 | 3 | THE COURT:  Well, that's significant. |
| 14:54:50 | 4 | MR. STEVENSON:  Yes.  If there's a -- if the |
| 14:54:52 | 5 | judgment encompasses a claim of patent infringement, all |
| 14:54:55 | 6 | of the claims then go up on appeal to the Federal |
| 14:54:59 | 7 | Circuit.  Yes. |
| 14:54:59 | 8 | THE COURT:  No.  I mean, it's significant in |
| 14:55:01 | 9 | terms of the mechanics of the case and the outcome of |
| 14:55:04 | 10 | the case for the circuit review to be in the Federal |
| 14:55:11 | 11 | Circuit rather than in the Fourth Circuit.  And I won't |
| 14:55:13 | 12 | elaborate on that; you can draw your own conclusions. |
| 14:55:17 | 13 | Anyway. |
| 14:55:18 | 14 | MR. STEVENSON:  Yes, Your Honor. |
| 14:55:19 | 15 | THE COURT:  Suffice it to say, I'm much more |
| 14:55:21 | 16 | comfortable in the Federal Circuit than I am in the |
| 14:55:24 | 17 | Fourth Circuit. |
| 14:55:27 | 18 | MR. STEVENSON:  Mr. Arovas and I both do a |
| 14:55:28 | 19 | lot of work in the -- |
| 14:55:29 | 20 | THE COURT:  Excuse me? |
| 14:55:29 | 21 | MR. STEVENSON:  Mr. Arovas and I both do a |
| 14:55:33 | 22 | lot of work in the Federal Circuit as well. |
| 14:55:34 | 23 | THE COURT:  Yeah, it's a great court. |
| 14:55:36 | 24 | MR. STEVENSON:  And they're a fine court. |
| 14:55:39 | 25 | So I said there were three reasons -- or |

14:55:41    1    three pillars of proof.  One is our rates have already

14:55:43    2    been adjudicated to be FRAND by the -- the U.S. District

14:55:49    3    Court and confirmed by the Fifth Circuit.  And we're

14:55:52    4    holding the same rate open for Lenovo.

14:55:54    5         That offer is, by the way, on the table

14:55:56    6    today.  We're keeping it open.  That offer is available

14:56:01    7    to them, and it is for 5G technology, which is more

14:56:06    8    valuable than 4G.  But it is a compromise, and to try to

14:56:10    9    get a deal done, we have offered the 4G adjudicated rate

14:56:15    10   to Lenovo for 5G.  And we have more 5G patents than 4G.

14:56:20    11   We have a stronger 5G portfolio than 4G.  But again --

14:56:26    12   so we have already made a very significant concession.

14:56:29    13        Second, I mentioned to Your Honor that our

14:56:30    14   rates have been accepted by the industry as well as the

14:56:33    15   courts.  And here's what I mean by that.  I put in the

14:56:42    16   slide just a picture -- I mean, you don't have to turn

14:56:44    17   to it -- of a meeting.  This is one of the 3GPP working

14:56:49    18   group meetings.  There is dozens of working groups that

14:56:52    19   divide up the work of the cell phone and all the -- all

14:56:55    20   the companies bring their engineers to them.  And as I

14:56:58    21   said, it's a bit of a competition.  All of the companies

14:57:01    22   bring their best ideas and Ph.D. --

14:57:05    23        THE COURT:  You notice that this courtroom

14:57:06    24   is a technology desert.

14:57:08    25        MR. STEVENSON:  We have lights.

14:57:11  1                THE COURT:  If you inquired in advance, you

14:57:12  2      would know that we're in the 19th, not the 21st century.

14:57:18  3      And I like it that way.

14:57:19  4                MR. STEVENSON:  Sometimes that's better, you

14:57:21  5      know.

14:57:21  6                THE COURT:  I like it that way.

14:57:22  7                MR. STEVENSON:  I think PowerPoints can

14:57:24  8      overwhelm sometimes.

14:57:25  9                THE COURT:  I've had enough authority to

14:57:27  10     forbid any technology in the courtroom.  I can't do that

14:57:32  11     in Raleigh, but I can do it here.

14:57:37  12                MR. STEVENSON:  That's why we use paper with

14:57:38  13     Your Honor.

14:57:39  14                And -- but going back to these meetings,

14:57:42  15     they're a bit of a competition.  All of the companies

14:57:45  16     bring their inventions, and the best inventions are

14:57:48  17     selected for the next standard.  Which they're going to

14:57:50  18     start working on 6G soon.

14:57:51  19                THE COURT:  This 3GPP working group meeting,

14:57:55  20     photo 3, looks like people taking the bar exam.

14:58:00  21                MR. STEVENSON:  Those are all Ph.D. cellular

14:58:04  22     engineers who --

14:58:04  23                THE COURT:  And have chosen not to become

14:58:06  24     lawyers.

14:58:06  25                MR. STEVENSON:  Yes.  But these are the

14:58:10  1  people that make your cell phone what it is.  This is

14:58:12  2  how your cell phone gets to be your cell phone.  It's

14:58:14  3  why it's so much better.  Ericsson sends a contingent.

14:58:19  4  A lot of the other companies send contingents there.

14:58:22  5          Here's what's important about that:  Before

14:58:25  6  drafting work began work on the 5G standard, Ericsson,

14:58:31  7  to be very transparent, and to avoid the problem Your

14:58:36  8  Honor alluded to of, well, how do you get people to, you

14:58:40  9  know, not contest your rates after you've given the

14:58:42  10  technology and you put it out there and you can't take

14:58:44  11  it back away?  How do you solve that?  To get ahead of

14:58:48  12  that problem, Ericsson announced, before drafting began

14:58:53  13  on the 5G standard, we expect our royalty rate for 5G to

14:59:00  14  be $5 per phone.  And it was a public announcement that

14:59:05  15  was done by press release, and it's on slide 5.  The

14:59:10  16  whole industry saw it.

14:59:12  17          And then we got to the meetings.  And not

14:59:16  18  unlike, you know, going to a restaurant and knowing the

14:59:19  19  price of the hamburger you're about to order before you

14:59:21  20  buy it, we told them exactly what the price of

14:59:25  21  Ericsson's technology was going to be.  Lenovo goes to

14:59:27  22  these meetings too.  They attend them.  And anybody who

14:59:30  23  goes to one of these meetings can raise their hand and

14:59:33  24  object to a inclusion of technology.  It's a

14:59:37  25  consensus-based environment.  Which means opposition by

14:59:39  1  one or two parties is enough to keep a certain

14:59:42  2  technology from coming into the standard.

14:59:47  3        On a very consistent basis, Ericsson's

14:59:51  4  technology was continued to be chosen for inclusion with

14:59:55  5  full knowledge of the price.  And in fact, at a higher

15:00:00  6  uptake than it had been for 4G.  And that was at $5 per

15:00:05  7  phone.  We're offering a concession -- a substantial

15:00:08  8  concession off of that to Lenovo right now.

15:00:13  9        Third, I mention to Your Honor as well that

15:00:18  10  our rates have been market tested.  They've been tested

15:00:21  11  in the licensing market.  There's an entire market out

15:00:26  12  there of licensing -- patent licensing.  And they're

15:00:32  13  handled -- and licensing matters are handled by

15:00:35  14  licensing professionals for the companies that do

15:00:38  15  business here.  All of the companies in this area have

15:00:40  16  very sophisticated licensing teams.

15:00:45  17        We included, Your Honor, a sample of license

15:00:49  18  agreements that Ericsson has entered into with

15:00:54  19  competitors to Lenovo and any companies Lenovo doesn't

15:00:58  20  compete with.  Companies like Samsung, HP, Panasonic,

15:01:03  21  Sony.  All of which are consistent with the rates that

15:01:07  22  we are offering to Lenovo.  Those are signed license

15:01:10  23  agreements.  That's Exhibit 3 to our opposition.  We

15:01:15  24  have an economist declaration from a gentleman named

15:01:19  25  Robert Mills who has gone through those agreements and

15:01:21  1    has presented a number of them to the Court.

15:01:25  2            The market for licensing is very important

15:01:27  3    for us.  I know that Your Honor has undoubtedly dealt

15:01:31  4    with comparable licenses before in patent infringement

15:01:34  5    cases.  When you're setting damages, it's the same

15:01:36  6    concept.  And it's not much different than when you buy

15:01:39  7    a house and you look at comparables in the neighborhood

15:01:42  8    and you see how much your neighboring house is selling

15:01:44  9    for, what should I pay for this house?  You look at the

15:01:47  10   market rate.  That is evidence of the market rate.

15:01:50  11           And it is an extremely sophisticated market.

15:01:53  12   Because the companies that Ericsson licenses with are

15:01:58  13   generally in attendance at these meetings.  They see

15:02:01  14   firsthand the technology Ericsson brings to the table

15:02:05  15   and what's competing against it.  They're hard-fought,

15:02:09  16   highly sophisticated negotiations, and they result in

15:02:13  17   deals that I think are very determinative, very good

15:02:16  18   data points for what the value of Ericsson's patent

15:02:21  19   portfolio -- it's an industry-leading patent portfolio,

15:02:24  20   what it is worth.  All of that being taken together on

15:02:31  21   the merits.

15:02:34  22           What Lenovo is here saying is, Judge, we

15:02:39  23   want you to interfere with the conduct of foreign

15:02:45  24   litigation, sovereign litigation, and patent

15:02:49  25   infringement cases.  And the patents are -- that are

15:02:51   1   issued in other countries are the property of that

15:02:54   2   country.  You can't sue on a Brazilian patent in U.S.

15:02:57   3   court.  Each country controls its own patent system and

15:03:00   4   its own procedures.  And I'm going to talk a lot about

15:03:04   5   Colombia and Brazil and those procedures.

15:03:06   6          But they're asking the Court to take the

15:03:08   7   very extraordinary step of interfering with a foreign

15:03:10   8   sovereign proceeding.  And their argument is basically

15:03:15   9   we might end up having to accept Ericsson's offer which

15:03:20   10  is FRAND.  It's been adjudicated FRAND by courts.  It's

15:03:24   11  been tested and accepted by the industry, and it is the

15:03:28   12  subject of acceptance in the licensing market.

15:03:31   13         I will respectfully suggest to the Court

15:03:35   14  that there is absolutely no hardship in a company after

15:03:39   15  ten years finally signing an agreement that is fair,

15:03:45   16  reasonable, and nondiscriminatory as adjudicated.

15:03:50   17         Second, moving off the equities a bit, you

15:03:58   18  asked the question, well, you know, courts don't set

15:04:01   19  prices.  Right?  And we agree with that, courts don't

15:04:04   20  set prices.  Courts don't create contracts.  What's

15:04:07   21  pending before Your Honor is a breach of contract suit

15:04:10   22  which will result in a verdict of whether there was a

15:04:14   23  breach or not by Ericsson.  Damages, if there was a

15:04:19   24  breach; no damages if there isn't a breach.  And that's

15:04:22   25  really what is before this Court.  Brazil and Colombia

15:04:28   1   won't interfere with the process of the Court going

15:04:31   2   forward, impanelling the jury, and trying that case.

15:04:36   3   These are parallel proceedings.  Completely parallel

15:04:40   4   proceedings.  And I'm going to talk a little bit more

15:04:42   5   about the court cases in this area.  But they have all

15:04:45   6   recognized that it is perfectly acceptable for court

15:04:47   7   cases to go on in parallel even if they raise similar

15:04:50   8   issues in an international context.  That happens all

15:04:54   9   the time.

15:04:56   10           Third point, let's talk about Brazil and

15:04:58   11   Colombia.  There was a strong implication and, in fact,

15:05:04   12   express suggestion in the briefing of Lenovo that the

15:05:08   13   South American cases were ex parte and secret, and I

15:05:14   14   think they said coerced.  I take issue with that.  I

15:05:18   15   don't think it's correct.  So I would like to go into

15:05:20   16   the facts on the record and starting with Brazil.

15:05:25   17           The Brazilian injunction was not granted

15:05:28   18   ex parte and it was not in secret.  And here's the proof

15:05:32   19   of that.  Lenovo -- Ericsson filed its suit in Brazil on

15:05:41   20   November 21st.  We asserted two 5G patents.  And this is

15:05:46   21   in Exhibit 1.  We have a declaration from our Brazilian

15:05:51   22   counsel in the record -- Exhibit 1 in the record of our

15:05:53   23   opposition.  When we filed the case -- it is not notice

15:05:56   24   pleading in Brazil like it is here.  It is a very

15:06:00   25   lengthy, detailed complaint, replete with claim charts,

15:06:05  1   expert reports, the whole nine yards.  Complete

15:06:08  2   technical analysis.  When we filed it, it was public.

15:06:13  3   And it is the common practice in Brazil to monitor the

15:06:18  4   docket for filings.  That is exactly what Lenovo did.

15:06:24  5   Lenovo was monitoring the Brazilian docket and, on

15:06:29  6   November 23rd, over a week before -- or, excuse me, four

15:06:34  7   days before the injunction was ruled upon, Lenovo filed

15:06:37  8   a 16-page response brief in Brazil that was considered

15:06:42  9   by the Court.  That is not ex parte and that is not

15:06:45  10  secret.

15:06:48  11          Lenovo, in fact, in its brief requested that

15:06:51  12  the case be sealed.  So any secrecy was at its behest.

15:06:56  13  It's the one who requested sealing.  We responded on

15:07:01  14  November 24th, and we submitted a rebuttal brief to

15:07:05  15  Lenovo.  And Lenovo filed a 12-page surrebuttal brief --

15:07:11  16  again, all before the Brazilian court ruled -- on

15:07:14  17  November 27th of last year.  This is at Exhibit 1.  And

15:07:18  18  this discussion is at paragraphs 24 through 27 of the

15:07:24  19  affidavit of our Brazilian counsel that's at Exhibit 1.

15:07:29  20          The injunction issued on November 27th.  In

15:07:33  21  it, the judge specifically referenced that he considered

15:07:37  22  Lenovo's filings and that Lenovo had appeared and

15:07:41  23  participated in the proceeding.  So in sum, they

15:07:45  24  submitted two briefs before the preliminary injunction

15:07:47  25  issued totalling 28 pages.  And in there, they made all

15:07:52   1    the same arguments they're making here.  They argued

15:07:56   2    about FRAND.  They argued about standard essential

15:07:59   3    patents.  They made the arguments they're making in

15:08:01   4    their briefs here.  Those were rejected by the Brazilian

15:08:05   5    first instance court who granted the injunction that it

15:08:08   6    was not ex parte and it was not secret under any

15:08:11   7    definition of those terms.

15:08:17   8           Now, they have appealed and it is currently

15:08:19   9    pending.  The injunction can also be reconsidered by the

15:08:23   10   first instance court at any time.  And the injunction --

15:08:27   11   the appeal proceedings take roughly six months; maybe

15:08:31   12   shorter, maybe longer.  And I would imagine there's a

15:08:34   13   provision in Brazil where it can be expedited.  But they

15:08:39   14   are making those arguments in Brazil regarding a

15:08:42   15   Brazilian patent with a sovereign Brazilian court

15:08:46   16   system.  And what they're basically asking Your Honor to

15:08:50   17   do is take the same arguments, agree with them, and then

15:08:56   18   basically quash the injunction, prevent us from

15:08:59   19   enforcing it, instead of allowing the Brazilian court to

15:09:02   20   consider who issued the order to consider their

15:09:05   21   arguments.

15:09:05   22           THE COURT:  Is it extraterritorial or does

15:09:07   23   it just apply in Brazil?

15:09:09   24           MR. STEVENSON:  It just applies in Brazil.

15:09:10   25   It is a Brazilian patents that only covers Brazilian

15:09:15  1   citizens.

15:09:15  2              THE COURT:  And it's all written in

15:09:17  3   Portuguese?

15:09:17  4              MR. STEVENSON:  Yes.  Well, I had to go from

15:09:20  5   translations, and I don't know if it's Portuguese.  But

15:09:23  6   yes, it's written in a language I do not understand.

15:09:27  7              Colombia.  Ericsson filed suit in Colombia

15:09:31  8   on eight patents.  Now, in Colombia, the way their

15:09:34  9   procedures are set up -- and this is in Exhibit 2, which

15:09:37  10  is the declaration of our Colombian counsel.  Each

15:09:43  11  patent is a separate suit, and each party is a separate

15:09:46  12  suit.  So if you have a single patent against multiple

15:09:50  13  parties, you have to bring that in separate suits.  So

15:09:52  14  there is about a total of 30 patent suits pending but

15:09:55  15  it's really eight patents.  And those were filed between

15:10:00  16  November 20th and November 28th.  A majority of those

15:10:03  17  cases were filed on November 24th.

15:10:05  18              And again, it is a public filing.  And as is

15:10:09  19  the case in South America, it is accessible by

15:10:13  20  monitoring the docket.  In fact, we know Lenovo's

15:10:17  21  counsel in Colombia was monitoring the docket because on

15:10:22  22  December 1st, about a week after they were filed, their

15:10:25  23  lawyer began submitting requests for access to the

15:10:30  24  filings in those cases.  And their lawyer has submitted

15:10:33  25  an affidavit with a chart on it that has, basically, for

15:10:36    1    each one of the cases when he began contacting the

15:10:39    2    court.  And most of those contacts were on December 1st.

15:10:44    3         Again, complaints in Colombia are detailed.

15:10:46    4    It is not notice pleading.  They're basically expert

15:10:49    5    reports, lengthy technical analysis.  Of the eight

15:10:54    6    patents, an injunction has been granted on one of them.

15:10:58    7    It issued on December 13th.  So doing the math, they

15:11:04    8    were aware and were monitoring the docket as of

15:11:07    9    December 1st.  Took no steps to file an opposition and

15:11:11   10    the injunction was granted on the 13th.  But Lenovo has

15:11:16   11    submitted oppositions in other of the cases.  In fact,

15:11:19   12    about four of the cases.  One of the injunctions has

15:11:22   13    been denied as I'm informed by Colombian counsel.

15:11:27   14         But the bottom line is in every one of these

15:11:29   15    proceedings, Lenovo had the right to submit opposition

15:11:32   16    papers.  And, in fact, did.  It submitted requests to

15:11:37   17    access the file, which are routinely granted in

15:11:40   18    Colombia.

15:11:41   19         And as to the one injunction that was

15:11:44   20    granted as to the one patent, Lenovo has two de novo

15:11:51   21    options in Colombia.  One is to file a motion for

15:11:53   22    reconsideration with the first instance judge or to file

15:11:57   23    an appeal with the appeals court.  And it's not like an

15:12:01   24    appeal here where there's a clearly erroneous standard

15:12:04   25    or something of that ilk.  It is a full de novo appeal.

15:12:09  1   De novo review in the appeals court in Colombia.  It

15:12:12  2   takes about four to six months.  And the trial in

15:12:16  3   Colombia must occur -- the full trial on the merits must

15:12:19  4   occur within 12 months.  And that's in the Larte

15:12:24  5   [phonetic] declaration which is Exhibit 2.  And this is

15:12:26  6   in paragraphs 7 through 17.

15:12:29  7            So, again, Colombia was not secret, although

15:12:34  8   the one injunction issued ex parte.  It happened two

15:12:39  9   weeks after -- or close to two weeks -- 12 days -- after

15:12:42  10  Lenovo had been monitoring the docket.  And they chose

15:12:46  11  not to file an opposition.  But they can seek

15:12:50  12  reconsideration of it at any point and be entitled -- or

15:12:53  13  they can appeal it and be entitled to a de novo review.

15:12:57  14            So that is, in a nutshell, Brazil and

15:13:00  15  Colombia.  I think they have been largely

15:13:03  16  mischaracterized in the briefing as ex parte, secret,

15:13:08  17  and coercive proceedings.  These -- this is the

15:13:12  18  procedures that occur in these countries.  That's how

15:13:15  19  the judicial system worked.  It's different than ours.

15:13:18  20  But Lenovo has a right to be heard.  And they should not

15:13:23  21  be surprised that patent infringement suits are being

15:13:27  22  brought given that they've rejected an offer that has

15:13:30  23  been adjudicated FRAND and that has been accepted by the

15:13:34  24  market.

15:13:39  25            A final point, Your Honor.

| | | |
|---|---|---|
| 15:13:42 | 1 | THE COURT: Seriously? |
| 15:13:44 | 2 | MR. STEVENSON: Sorry? |
| 15:13:44 | 3 | THE COURT: Seriously? |
| 15:13:46 | 4 | MR. STEVENSON: Yes. |
| 15:13:46 | 5 | THE COURT: Okay. |
| 15:13:47 | 6 | MR. STEVENSON: Final point. Unless Your |
| 15:13:49 | 7 | Honor has questions. |
| 15:13:50 | 8 | THE COURT: Yeah. No, that's fine. |
| 15:13:51 | 9 | MR. STEVENSON: I don't want to tax our time. |
| 15:13:54 | 10 | THE COURT: I mean, some people use that as |
| 15:13:57 | 11 | a figure of speech. |
| 15:13:59 | 12 | MR. STEVENSON: Your Honor, I started my |
| 15:14:01 | 13 | practice and I learned well before a judge in Midland, |
| 15:14:05 | 14 | Texas, named Lucius Bunton. And he's since passed away. |
| 15:14:09 | 15 | THE COURT: Oh, I knew him. We served |
| 15:14:11 | 16 | together on a committee for five years of the judicial |
| 15:14:15 | 17 | conference. He was a wide-open fella. |
| 15:14:19 | 18 | MR. STEVENSON: He was. I tried a |
| 15:14:21 | 19 | securities fund -- |
| 15:14:21 | 20 | THE COURT: Lucius Bunton. Yeah, he used to |
| 15:14:23 | 21 | tease me all the time. |
| 15:14:26 | 22 | MR. STEVENSON: He teased me, too. |
| 15:14:27 | 23 | THE COURT: He thought I was ambitious. |
| 15:14:30 | 24 | I've proved him wrong. |
| 15:14:32 | 25 | MR. STEVENSON: Well, he had a rule and I |

15:14:34  1   learned well from him.  He had two rules.

15:14:36  2             THE COURT:  Lucius Bunton.  Thank you for

15:14:38  3   reminding me.

15:14:39  4             MR. STEVENSON:  He had a one-approach rule,

15:14:41  5   which meant -- this is back before all of the Elmos --

15:14:44  6             THE COURT:  He was a distant relative of

15:14:47  7   Johnson's, of Lady Bird's, or one of them.

15:14:50  8             MR. STEVENSON:  I think he was.

15:14:51  9             THE COURT:  Yeah, he used to tell me about

15:14:53 10   that.

15:14:55 11             MR. STEVENSON:  His rule was you have one

15:14:58 12   approach.  And that was back when we had paper depos and

15:15:01 13   paper, paper, paper, before all of the electronics.  And

15:15:04 14   if you needed to impeach or needed to show someone a

15:15:08 15   depo and you forgot to take it on your one approach, you

15:15:11 16   were out of luck.

15:15:12 17             And his second rule was if you stood up and

15:15:15 18   said, "Judge, I've just got two questions of this

15:15:15 19   witness," after your second question, you were cut off.

15:15:18 20   So when I tell you I have one final point, I have one

15:15:22 21   final point.  And it is this:

15:15:25 22             Mr. Arovas had mentioned the Motorola

15:15:29 23   license.  That license doesn't cover any patents.  And

15:15:33 24   it's clear as day on its face.  They were filed for

15:15:37 25   after December 31st -- or, excuse me -- yes, they were

15:15:40  1   filed after December 31st, 2015.  The patents in this

15:15:43  2   case, the patents we're asserting at the ITC, for

15:15:47  3   instance, those are all well after that date.  So none

15:15:49  4   of them, by the express terms of the Motorola license,

15:15:53  5   are contained within that license.  So I think reference

15:15:57  6   to that license doesn't affect the patents before Your

15:15:59  7   Honor, and it doesn't affect, really, the 5G issues

15:16:03  8   before Your Honor and the 5G valuation issues.

15:16:06  9          Your Honor, that's all I have.  I'm happy to

15:16:08  10  respond to questions.  If there's anything of concern

15:16:11  11  with the Court, I want to make sure I address it.  And

15:16:13  12  if I haven't addressed it, I would happy to.

15:16:15  13         THE COURT:  Thank you.  No, I've heard as

15:16:18  14  much I need to hear.  Thank you.

15:16:22  15         I don't think we need any rebuttal.  Do you

15:16:25  16  think we do?

15:16:26  17         MR. AROVAS:  If Your Honor will indulge, I

15:16:29  18  would appreciate the opportunity just to make a couple

15:16:32  19  of minutes' worth of points.

15:16:33  20         THE COURT:  All right.  Keep it brief.

15:16:34  21         MR. AROVAS:  So, just a couple of sort of

15:16:37  22  factual issues I would like to make sure I'm clear to

15:16:39  23  the Court.  We do take issue with Ericsson's suggestion

15:16:44  24  that they are somehow the innovator and Lenovo is

15:16:46  25  somehow a taker or infringer.  Lenovo is one of the

15:16:49  1   largest contributors to the standard, too.  It's

15:16:53  2   participated for many years independently as well as

15:16:57  3   through its Motorola subsidiary.  It has thousands of

15:17:01  4   patents.

15:17:02  5          And what we are talking about here is a

15:17:05  6   two-way license, not a one-way license.  This is not

15:17:07  7   about just setting a rate for Ericsson patents but it's

15:17:11  8   also got a fair value for Lenovo patents.  And, you

15:17:15  9   know, Lenovo has made major contribution to this

15:17:19  10  standard.

15:17:20  11         Second, nobody is taking anything from

15:17:26  12  anybody without authorization.  The entire purpose of

15:17:31  13  the standardization process, Your Honor, is to make the

15:17:35  14  standards available.  The patents get -- technology gets

15:17:40  15  adopted.  Patents may or may not be used.  The framework

15:17:43  16  is set off for cross-licensing.  This is exactly Lenovo

15:17:47  17  and everybody else in the world, including Ericsson.

15:17:49  18  Ericsson makes infrastructure equipment today using

15:17:53  19  Lenovo patents, and Lenovo is asserting its patents

15:17:55  20  against Ericsson.  The entire framework set up is the

15:18:00  21  standard that's adopted, parties are free to go forward

15:18:03  22  and adopt that standard.  It's a public standard.  And

15:18:06  23  then they negotiate or resolve the amount that is due.

15:18:10  24         Third, this notion that this 1 percent rate

15:18:14  25  has been adjudicated for purposes of Lenovo or

| | | |
|---|---|---|
| 15:18:18 | 1 | adjudicated for 5G is simply not true.  The HTC case |
| 15:18:24 | 2 | that Mr. Stevenson refers to was about 4G technology, |
| 15:18:29 | 3 | not the 5G technology.  Different generations.  4G is, |
| 15:18:33 | 4 | obviously, subject to the Motorola license.  So not even |
| 15:18:36 | 5 | really an issue. |
| 15:18:38 | 6 | Second, all of those patents, the 4G patents |
| 15:18:42 | 7 | that are recycled and reused we believe are already |
| 15:18:46 | 8 | licensed, a fundamental difference between HTC and |
| 15:18:51 | 9 | Lenovo.  And the Court itself -- and I think this is |
| 15:18:54 | 10 | important.  Mr. Stevenson talked about comparable |
| 15:18:58 | 11 | licenses.  I talked about comparable licenses as sort of |
| 15:19:00 | 12 | setting the market price.  The Court itself, when it |
| 15:19:04 | 13 | looked at the HTC rate that offered Ericsson made for |
| 15:19:10 | 14 | HTC, noted the larger plaintiffs -- Apple, Samsung, |
| 15:19:15 | 15 | companies like that, the types of companies are most |
| 15:19:17 | 16 | similar to Lenovo -- got substantially different rates. |
| 15:19:21 | 17 | The question of whether this 1 percent is |
| 15:19:23 | 18 | adjudicated or even paid by anybody is, I would say, |
| 15:19:28 | 19 | disproven by the HTC opinion.  Certainly, it's |
| 15:19:33 | 20 | completely in dispute.  And Lenovo wasn't represented, |
| 15:19:38 | 21 | wasn't involved in that case at all.  There is an active |
| 15:19:41 | 22 | issue right in this case about what the fair rate is.  I |
| 15:19:45 | 23 | would say the evidence shows that HTC rate has nothing |
| 15:19:48 | 24 | to do with what a fair rate would be for a cross-license |
| 15:19:51 | 25 | between these parties. |

|       |     |                                                           |
|-------|-----|-----------------------------------------------------------|
| 15:19:53 | 1 | Turning to the equities.  The equities favor |
| 15:19:59 | 2 | preserving the status quo to allow the threshold |
| 15:20:04 | 3 | issues -- contractual issues in this case to be decided. |
| 15:20:07 | 4 | The very issue being presented to Your Honor is whether |
| 15:20:12 | 5 | injunctive relief is appropriate in the first instance. |
| 15:20:16 | 6 | That's exactly what the Microsoft case and the Huawei |
| 15:20:21 | 7 | case decide.  Give us breathing room because the |
| 15:20:25 | 8 | question has to be answered in the first instance is |
| 15:20:27 | 9 | injunctive relief at all permissible before people can |
| 15:20:32 | 10 | go and get the injunctions.  It's putting the heart -- |
| 15:20:35 | 11 | the horse before the cart -- or the cart before the |
| 15:20:38 | 12 | horse. |
| 15:20:38 | 13 | And there is no hardship to Ericsson here. |
| 15:20:41 | 14 | No hardship at all.  There has been a promise that they |
| 15:20:45 | 15 | have made -- they knew going into this process, these |
| 15:20:49 | 16 | patents were going to be licensed.  Lenovo is committed |
| 15:20:51 | 17 | that it is going to pay a FRAND rate and Lenovo has made |
| 15:20:56 | 18 | offer after offer to give the path -- and these are all |
| 15:20:59 | 19 | still open -- to Ericsson to get that rate resolved. |
| 15:21:03 | 20 | Whether it's through this case, the U.K. case, through |
| 15:21:06 | 21 | arbitration, through interim payments.  All of those are |
| 15:21:09 | 22 | on the table for Ericsson.  There is simply no reason |
| 15:21:14 | 23 | other than to try to leapfrog these issues and the |
| 15:21:18 | 24 | determination of the fair rate for these injunctions to |
| 15:21:23 | 25 | stay in force. |

15:21:23   1          And with regard to Colombia and Brazil, I

15:21:26   2   want to be crystal clear with that.  The Brazilian court

15:21:29   3   itself, after seeing Lenovo's paper, said it should be

15:21:34   4   noted that the issues have not been subject -- submitted

15:21:40   5   to the adversarial process.  Lenovo had days to file a

15:21:46   6   paper, the injunction had already issued.  In Colombia,

15:21:50   7   everything is completely ex parte.  Lenovo has had no

15:21:56   8   opportunity to present its case other than through

15:21:58   9   appeal.  That is going to take six to eight months.

15:22:02  10          And so what we are simply asking the Court

15:22:04  11   is to deal with the issue of the irrevocable harm that

15:22:08  12   is occurring in a contract case with the availability of

15:22:11  13   that injunction and worldwide license is the very issue

15:22:14  14   in dispute, and to allow that to progress before those

15:22:20  15   injunctions are allowed to go into force.

15:22:24  16          We also have concern that Ericsson will go

15:22:28  17   to the Colombian courts and ask for relief to interfere

15:22:31  18   with this motion.  And so that's why we're asking for

15:22:35  19   preliminary relief.  Allow the threshold issue to go

15:22:39  20   forward in this case, preserve the status quo.  It has

15:22:43  21   no hardship on Ericsson.  Promise to license for

15:22:47  22   monetary terms which will all be determined here or in

15:22:50  23   any of those other forums at Ericsson's choice.  Thank

15:22:54  24   you.

15:22:54  25          THE COURT:  All right.  Thank you all for

15:22:55    1    your presentation.  And I'll give you a written order as

15:22:58    2    soon as I can.  We'll be in recess.

15:23:28    3                    (The proceedings concluded at 3:23 p.m.)

            4                            *      *      *

            5

            6

            7

            8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

```
 1                  UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF NORTH CAROLINA

 3

 4

 5              CERTIFICATE OF OFFICIAL REPORTER

 6

 7              I, Jennifer C. Carroll, RMR, CRR, CRC,

 8     Federal Official Court Reporter, in and for the United

 9     States District Court for the Eastern District of North

10     Carolina, do hereby certify that pursuant to Section

11     753, Title 28, United States Code, that the foregoing is

12     a true and correct transcript of the stenographically

13     reported proceedings held in the above-entitled matter

14     and that the transcript page format is in conformance

15     with the regulations of the Judicial Conference of the

16     United States.

17

18

19     Dated this 16th day of January, 2024.

20

21

22                         /s/ Jennifer C. Carroll
                           Jennifer C. Carroll, RMR, CRR, CRC
23                         U.S. Official Court Reporter

24

25
```

# Exhibit B

**Filed Under Seal**